Filed:  April 26, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON


DAVID EADS
and DIANE EADS,
 individually and as husband and wife,

Petitioners on Review,


v.


TIMOTHY R. BORMAN, D.O.;
SALEM HOSPITAL,
a registered Oregon non-profit corporation;
MICHAEL J. GEORGE, M.D.;
and SALEM RADIOLOGY CONSULTANTS, P.C.,
an Oregon Professional Corporation,

Defendants,


and


WILLAMETTE SPINE CENTER, LLC,
an Oregon corporation,

Respondent on Review.

(CC 05C18610; CA A137410; SC S058445)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 1, 2011.

Maureen Leonard, Portland, argued the cause for petitioners on review.  With her on the brief was David K. Miller.

Richard A. Lee, Bodyfelt Mount LLP, Portland, argued the cause for respondent on review.  On the brief was Pamela A. Stendahl.

Thomas M. Christ, Cosgrave Vergeer Kester LLP, argued the cause and filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

Kathryn H. Clarke, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

LINDER, J.

The decision of the Court of Appeals and the judgment of the trial court are affirmed.

De Muniz, C. J., specially concurred and filed an opinion in which Durham and Walters, JJ., joined.

\*Appeal from Marion County Circuit Court, Don A. Dickey, Judge. 234 Or App 324, 227 P3d 826 (2010).

LINDER, J.

Plaintiff underwent surgery performed by a physician whose office was in a building that defendant, a limited liability company (LLC), leased to medical providers.[1] The surgeon performed the surgery negligently, causing plaintiff permanent and disabling injuries. Plaintiff brought this malpractice action against the LLC landlord, as well as against the surgeon and others involved in his medical treatment. Plaintiff pursued the action against the LLC on a theory of apparent agency. Specifically, plaintiff's theory was that, through the signage on the building and other representations, the LLC created the appearance that the building housed a group medical entity of which plaintiff's surgeon was an agent. The trial court granted summary judgment for the LLC, concluding that the evidence was legally insufficient to hold the LLC vicariously liable for the surgeon's negligence on an apparent agency theory. The Court of Appeals agreed, and affirmed. *Eads v. Borman*, 234 Or App 324, 227 P3d 826 (2010).

We granted plaintiff's petition for review to resolve when a nonnegligent person or entity may be held vicariously liable on an apparent agency theory for physical injuries negligently inflicted by a medical professional. We conclude that, for such liability to arise, the injured party must have dealt with the negligent medical professional based on a reasonable belief, traceable to the putative principal's conduct or

---

[1] There are two named plaintiffs in this case -- David Eads, who was injured, and his wife. For ease of reference, we refer to Eads and his wife in the singular.

1

representations, that the medical professional was the principal's employee or was otherwise subject to the principal's right of control in providing the medical services that caused the injured party's injury. As we will explain, the record in this case was insufficient to permit a jury to find the LLC vicariously liable for the surgeon's negligence on that basis. We therefore affirm the judgment of the trial court and the decision of the Court of Appeals.

BACKGROUND

We review the record in the light most favorable to plaintiff, as the party opposing the motion for summary judgment. *Bergmann v. Hutton*, 337 Or 596, 599, 101 P3d 353 (2004). The LLC involved in this case -- Willamette Spine Center, LLC -- is in the business of commercially leasing real property. In furtherance of its business, the LLC leased two buildings under terms that permitted it to sublease offices in the buildings to medical professionals. The LLC denominated one of those buildings -- the building involved in this case -- as "Willamette Spine Center" and leased offices in it to medical professionals with specialties related to spinal care and treatment. The LLC placed a sign on the building's exterior identifying it as "Willamette Spine Center." A second sign in front of the building similarly read "Willamette Spine Center" and also displayed a logo consisting of the stylized initials "WSC."

The names of the various medical provider tenants were listed near the door into the office building. Some of the providers were themselves limited liability companies, held themselves out as such, and incorporated the words "Willamette Spine Center" into their professional names (*i.e.*, "Willamette Spine Center Ambulatory

2

Surgery, LLC" and "Willamette Spine Center Physical Therapy and Rehabilitation, LLC"). Other medical providers used their individual names only, without any reference to Willamette Spine Center. Although the LLC landlord did not require it, all or many of the tenants used business cards that included "Willamette Spine Center" and the WSC logo on them, either at the top of the card or as part of their office address. Their business cards then listed their names, professional credentials and specialty areas, and contact information. The contact information, such as phone numbers and e-mail addresses, differed among the various providers in the building.

One of the professionals who leased office space in the building was Dr. Freeman, a chiropractor who was also one of three members (*i.e.*, owners) of the LLC landlord. Plaintiff had become acquainted with Freeman through plaintiff's work as a manager at a Starbucks coffee shop. From their conversations at the coffee shop, plaintiff knew that Freeman was a chiropractor and knew that he was "affiliated" with the Willamette Spine Center. Freeman, in turn, knew that plaintiff suffered from back pain. Freeman suggested that plaintiff, to address his back pain, seek care "from practitioners at his clinic, the Willamette Spine Center." Based on his acquaintance with Freeman, plaintiff relied on Freeman's recommendation and treated with Freeman at his office in the Willamette Spine Center building. At some point, Freeman referred plaintiff to a physical therapist in that building, and plaintiff consulted with and received treatment from that physical therapist. Eventually, Freeman determined that plaintiff should be evaluated for possible surgery. Telling plaintiff that he "would set [plaintiff] up with 'one of the Willamette Spine Center surgeons,'" Freeman referred plaintiff to Dr. Borman, a

3

physician and surgeon who specialized in spinal surgery.

Borman was a tenant in the Willamette Spine Center building pursuant to an "association agreement" with Dr. Tiley, a physician who leased office space directly from the LLC. Through that association agreement, and with the LLC's knowledge and approval, Borman subleased space from Tiley. The two shared common areas (*e.g.*, exam rooms, patient waiting rooms), while maintaining separate staff and separate professional offices. Borman's business cards had "Willamette Spine Center" and the WSC logo printed at the top. Printed below those words and logo was Borman's name, his credentials and specialty, and his individual e-mail and phone contact information. Borman's letterhead did not have "Willamette Spine Center" or the WSC logo printed on it. All charges to Borman's patients were billed to Borman's individual professional accounts and processed through Borman's own office staff.

Plaintiff saw Borman at his office in the Willamette Spine Center building in August 2003. As part of his consultation with Borman, plaintiff filled out an "Initial Patient Health History" on a form that had only Borman's name printed on it, without any reference to Willamette Spine Center. Plaintiff, however, thought that all the tenants in the building where Freeman and Borman had their offices were "affiliated" with "the Willamette Spine Center." In particular, based on the fact that Borman's office was in the Willamette Spine Center building, plaintiff thought that Borman was "a Willamette Spine Center surgeon." Plaintiff was not aware of anything that suggested to him that Borman was "independent of the Willamette Spine Center."

Borman determined that surgery was appropriate for plaintiff, and plaintiff

4

decided to have that surgery. In September 2003, Borman performed two surgeries on plaintiff that caused him permanent and disabling injuries. Both surgeries were performed in a local hospital, not in the Willamette Spine Center building.

Plaintiff brought this malpractice action against the LLC,[2] alleging that the LLC did business as Willamette Spine Center, or held itself out to the public as doing so. Plaintiff further alleged that Borman "practiced at and did business under the name of Willamette Spine Center," and was therefore an apparent agent of the LLC. Plaintiff's theory, in essence, was that the LLC was vicariously liable for Borman's negligence because the LLC held itself out as a medical entity called Willamette Spine Center and held Borman out -- or permitted Borman to hold himself out -- as acting on behalf of and for the benefit of that entity.

The LLC moved for summary judgment, arguing that its activities and representations provided no basis for it to be held vicariously liable for Borman's negligence. In particular, the LLC urged that the evidence did not permit a jury to find that the LLC had promoted itself as some form of group medical entity or held out Willamette Spine Center to be such an entity, as opposed to a professional office building for which the LLC was the landlord. The LLC also urged that no evidence established that the LLC had held Borman out as its agent. According to the LLC, to whatever extent

---

[2] Plaintiff originally brought a malpractice action against Borman and the LLC, in addition to other defendants, including the local hospital. At this juncture in the case, all other defendants have been dismissed from the action and the LLC is the only remaining defendant.

plaintiff had relied on representations made by anyone other than the LLC that Borman was an agent of the LLC, those representations could not serve as a basis on which the LLC could be vicariously liable for Borman's negligence.

In response, plaintiff argued that a jury could conclude that the LLC, through its direct representations as well as acquiescence in representations made by the building tenants, held out Willamette Spine Center as a group medical entity and Borman as its authorized surgeon. Among other facts, plaintiff relied on the signage on the building, the tenants' (including Borman's) use of the building name and logo on their business cards, and Freeman's representations that he was affiliated with Willamette Spine Center as creating the appearance that Borman was the LLC's authorized agent. As noted earlier, the trial court granted the LLC's motion for summary judgment, agreeing that the evidence was insufficient for a jury to find that the LLC had held itself out as a group medical entity and had held Borman out as a surgeon for that entity. On appeal, the Court of Appeals agreed, and affirmed. *Eads*, 234 Or App 324.

On review, although their arguments have become more refined, the parties largely renew the positions that they advanced to the trial court and to the Court of Appeals. They focus their arguments less on the applicable legal principles and more on how those legal principles apply in this specific context -- *viz.*, a malpractice action seeking to hold another person or entity (here, the LLC) vicariously liable for injuries caused by a physician's negligence. We begin by outlining the principles that control the legal analysis. We then turn to the record in this case and whether the evidence created a jury question on the LLC's liability.

6

APPLICABLE LEGAL PRINCIPLES

The LLC's potential vicarious liability for Borman's negligent surgery requires consideration of two lines of settled agency law. The first identifies when a putative principal can be held responsible for the acts of another on an apparent agency theory. The second identifies when a principal can be held liable for the physical torts of an agent, actual or apparent.

Classically, an agency relationship "'results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act.'" *Vaughn v. First Transit, Inc.*, 346 Or 128, 135, 206 P3d 181 (2009) (emphasis in *Vaughn* omitted) (quoting *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 617, 892 P2d 683 (1995)). The agency relationship can arise either from actual consent (express or implied) or from the appearance of such consent. *See generally Taylor v. Ramsay-Gerding Construction Co.*, 345 Or 403, 410, 196 P3d 532 (2008) (so discussing). In either circumstance, the principal is bound by or otherwise responsible for the actual or apparent agent's acts only if the acts are within the scope of what the agent is actually or apparently authorized to do. *Id.*; *see also Beeson v. Hegsted*, 199 Or 325, 330, 261 P2d 381 (1953) (one cannot hold principal liable for an act that does not fall within the scope of agent's real or apparent authority).

In this case, plaintiff proceeds on a theory that Borman *appeared* to have

7

authority to act as the LLC's agent, not that Borman had actual authority to do so.[3]  Under this court's settled cases, "[a]pparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter."  *Jones v. Nunley,* 274 Or 591, 595, 547 P2d 616 (1976).  There accordingly are two keys to the analysis:  (1) the principal's representations; and (2) a third party's reasonable reliance on those representations.[4]

As to the first requirement -- the representation by a putative principal -- an agent's actions, standing alone and without some action by the principal, will not give rise

---

[3]  Both at trial and in the Court of Appeals, plaintiff also sought to hold the LLC liable on a theory that Borman was its actual agent.  Plaintiff no longer pursues that theory.

[4]  This court has used the common-law test for "apparent authority" to determine a principal's responsibility both for actual agents and apparent agents.  *See*, *e.g., Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 23-27, 803 P2d 1178 (1991) (using apparent *authority* analysis to resolve whether one was apparent *agent* with authority to take particular action); *Aerne v. Gostlow*, 60 Or 113, 121, 118 P 277 (1911) (similar).  *But see Eads v. Borman*, 234 Or App 324, 332 n 5, 227 P3d 826 (2010) (citing Court of Appeals cases for proposition that apparent authority analysis applies only to actual agents).  That approach makes sense.  Under general agency principles, establishing an agency (apparent or actual) is not enough to hold a principal responsible for an agent's conduct; rather, the action taken by the agent also must be one that was within the scope of the agent's actual or apparent authority.  *See Beeson*, 199 Or at 330 (one cannot hold principal liable for an act that does not fall within the scope of agent's real or apparent authority).  Thus, the apparent authority analysis often subsumes both issues.  *See*, *e.g.*, *Jones*, 274 Or at 595-96 (lack of apparent authority resolved issue of principal's potential vicarious liability; unnecessary to resolve whether putative agent was actual or apparent agent).  As we later observe, ___ Or at __ n 5, the *Restatement (Third) of Agency* (2005) takes the same approach.

8

to apparent authority. *Taylor*, 345 Or at 410. Rather, the principal must take some affirmative step in creating the appearance of authority, one that the principal either intended to cause or "should realize" likely would cause a third party to believe that the putative agent has authority to act on the principal's behalf. *Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 24-25 n 9, 803 P2d 1178 (1991) (quoting with approval *Restatement (Second) of Agency* § 27, comment a at 104 (1958)); *accord Taylor*, 345 Or at 410-11. The principal's words, conduct, or other representation need not be witnessed directly by or made directly to the third party, but the representation of authority must be traceable to the principal for the principal to be liable on a theory of apparent authority. *Id.*

As to the second key element -- reliance -- the third party, in deciding to deal with the apparent agent, must in fact rely on the principal's representation, and that reliance must be objectively reasonable. *Jones*, 274 Or at 595-96; *see also Badger*, 311 Or at 26 (describing reasonable reliance by plaintiff). In assessing the reasonableness of the reliance, the analysis is influenced by what is customary and usual for certain positions or within certain professions. *See id.* at 24 n 9 (generally recognized duties of a position can influence appearance of authority to act as agent (quoting with approval *Restatement (Second) of Agency* § 27, comment a at 104 (1958))).[5]

---

[5] The test that this court has followed for many years is consistent with the test that the *Restatement (Third) of Agency* now proposes, which uses an apparent *authority* analysis both for agents and apparent agents:

9

In this case, because plaintiff seeks to hold the LLC liable for Borman's physically injurious conduct, a second set of legal principles also comes into play. The *sine qua non* of a principal's vicarious *tort* liability is the principal's control of, or right to control, the agent's conduct. Significantly, vicarious liability for an agent's physical torts arises only if the principal has the right to control the agent's *specific injury-causing conduct* in particular. *Jensen v. Medley*, 336 Or 222, 237-38, 82 P3d 149 (2003). The principal's abstract right of control or right to control an agent in other respects is not enough. *Id.* The law therefore differentiates between employees and other agents for purposes of a principal's tort liability, with the result that, ordinarily, a principal is not liable for the negligence of a nonemployee, because a principal generally does not have

---

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."

*Restatement (Third) of Agency* § 2.03 (2005).

As the comments to that section explain, courts over the years have frequently used the terms "apparent agency" and "apparent authority" interchangeably. *Id*. at comment b. The Third Restatement therefore now uses the doctrine of apparent *authority* to determine when a principal is bound by actors who appear to be agents but are not, as well as agents who act beyond the scope of their actual authority. *Id*. at comment a. The test under the Third Restatement has the same key features as the test that this court has adopted: the third party must "reasonably believe the agent to be authorized," and that belief must be "traceable" to a manifestation by the principal that the person with whom the third party dealt is the principal's agent. *Id*. at comment b. Apparent authority also includes concepts of "usual authority" and "customary authority" in determining whether "a substantial basis for a third party's belief" exists that the person with whom the third party dealt was acting as an agent for a principal in a particular circumstance. *Id*.

10

the requisite right of control over those nonemployee agents. As this court explained in

*Vaughn*:

> "Distinguishing between employees and agents who are not employees is important for vicarious liability purposes, because a principal's liability for the torts of its agents varies based upon the type of agent. In general, a principal is liable for all torts committed by its employees while acting within the scope of their employment. *Minnis [v. Oregon Mutual Ins. Co.*, 334 Or 191, 201, 48 P3d 137 (2002)]. But a principal ordinarily is *not* liable in tort for physical injuries caused by the actions of its agents who are not employees. *Jensen v. Medley*, 336 Or 222, 230, 82 P3d 149 (2003). Rather, a principal is vicariously liable for an act of its nonemployee agent only if the principal 'intended' or 'authorized the result [ ]or the manner of performance of that act.' *Restatement (Second)* § 250; *see also Jensen*, 336 Or at 231 (principal liable for acts of nonservant agents only if those acts 'within the actual or apparent authorization of the principal'). In other words, for a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim."

346 Or at 137-38 (emphasis and second brackets in original; footnote omitted).[6]

---

[6]  Plaintiff's claim here against the LLC is based solely on a vicarious liability theory. As noted in *Vaughn*, a principal also can be liable for physical torts committed by an agent if the principal had a nondelegable duty of care or was negligent in hiring, instructing, or supervising the agent. In that circumstance, the principal's liability is direct, not vicarious, however. *Vaughn*, 346 Or at 138 n 7. Other theories, also not involved in this case, can likewise result in another entity or individual being directly or jointly liable for a treating physician's negligence. *See*, *e.g.*, *Sprinkle v. Lemley*, 243 Or 521, 528-31, 414 P2d 797 (1966) (physicians who diagnose and treat patient in concert can be liable for each other's negligence); *Moulton v. Huckleberry*, 150 Or 538, 549, 46 P2d 589 (1935) (physician who refers patient to another can be liable for negligence of other physician if that physician is an employee, partner, or agent of the referring physician, or if the referral was itself negligent); *Wemett v. Mount*, 134 Or 305, 315, 292 P 93 (1930) (physician partners in the practice of medicine are liable for each other's negligence); *see also Huffaker v. Bailey*, 273 Or 273, 282, 540 P2d 1398 (hospital has potential independent tort liability for negligent acts of physicians based on hospital's own negligence in hiring and supervising staff).

11

Consequently, although a principal can be vicariously liable for the negligence of an agent who is not an employee, such liability arises only if the principal actually or apparently had a right of control over the agent's injury-causing actions "similar to the control that an employer exercises over an employee[.]" *Vaughn*, 346 Or at 139.[7] The fact that a nonemployee is actually or apparently authorized in some general way to act on a principal's behalf is not a sufficient basis to impose vicarious liability on the principal for the actual or apparent agent's tortious conduct. *Id.* (quoting with approval *Restatement (Second) of Agency* § 250 comment b). Rather, to impose vicarious liability for a nonemployee agent's *physical conduct*, the principal must have -- or appear to have -- a right to control how the act is performed -- that is, "the physical details of the manner of performance" -- that is characteristic of an employee-employer relationship. *Id.* at 139 (citing *Restatement (Second) of Agency* § 250 comment a).[8]

---

[7] *Vaughn* and our other cases relying on the same principal are illustrative of the kind of control required. *See Vaughn*, 346 Or at 141-42 (although port authority had right to control some activities of shuttle company, port lacked control over day-to-day driving; port therefore not vicariously liable for shuttle driver's negligence); *Jensen*, 336 Or at 237-39 (international union not vicariously liable for wrongful employment actions of affiliated local union based only on local union's abstract authority to act for international union subject to its right of control; jury required to find international union had right to control specific conduct -- *i.e.*, hiring and firing employees -- on which claim was based); *Peeples v. Kawasaki Heavy Indust., Ltd.*, 288 Or 143, 149-50, 603 P2d 765 (1979) (motorcycle manufacturer not vicariously liable for negligent warranty service work performed by authorized local dealer where evidence did not establish manufacturer had right to control "the manner in which the dealer performed warranty service," even though local dealer was manufacturer's authorized agent for that purpose).

[8] The concurrence disagrees that the common law agency principles embraced by this court's settled cases apply in an action seeking to impose vicarious

VICARIOUS LIABILITY -- MEDICAL MALPRACTICE

This court has not previously addressed whether and under what circumstances vicarious liability for a physician's malpractice can be imputed to a putative principal on an apparent agency theory. Where the agency principles that we have outlined are satisfied, however, there is no reason why vicarious liability should not attach. The more significant question is how those tests should apply in the context of professional malpractice and, in particular, what must be shown to satisfy the requirement that a putative principal have a right -- or an apparent right -- of control over the tortious conduct of a medical professional. Because other courts have grappled extensively with vicarious liability in this context, we turn to the developed body of case law in other jurisdictions, which we consider helpful to our analysis.

Until recent decades, the requirement that the principal have a right (or

liability for tortious conduct on a theory of apparent rather than actual agency. __ Or at __ (slip op at 6-8) (De Muniz, C. J., specially concurring). Under the concurrence's approach, an apparent principal would be liable in tort in situations in which an actual principal would have no liability. But apparent agency, as explained, derives from the appearance of authority created by the principal and reasonably relied on by a third party. If the apparent relationship between the putative principal and the apparent agent is something other than what would be required to hold an actual principal vicariously liable for the agent's acts (*i.e.*, other than employment or other relationship in which the putative principal would exercise similar control), there is no legal basis for vicarious liability on an agency theory. In other words, apparent agency does not broaden the basis on which vicarious liability attaches; it instead exposes one to vicarious liability on established rules of agency law in circumstances in which the relationship necessary for such liability reasonably appears to exist but in fact does not.

13

apparent right) of control over an agent's injury-causing conduct has precluded vicarious liability for the malpractice of physicians and similar professionals. Traditionally, courts reasoned that medical professionals, because of the skill and judgment they exercised, were not subject either legally or practically to sufficient control by other persons or entities to expose those persons or entities to vicarious liability for a medical professional's negligence. *See Bing v. Thunig*, 2 NY2d 656, 661-63, 143 NE2d 3 (1957) (describing historical view of courts that physicians, due to the nature of their professional expertise, were not subject to hospital's right of control). That was true even when a physician was an employee of a hospital or other entity. *See*, *e.g.*, *Iterman v. Baker*, 214 Ind 308, 316-18, 15 NE2d 365 (1938) (so holding); *see generally Bing*, 2 NY2d at 661-63 (describing traditional view).

That thinking has given way, almost universally, to the recognition that entities that employ physicians both can, and in fact do, significantly control the overall delivery of medical services by such professionals, even if the entity does not direct a professional's discrete actions in treating individual patients. Hospitals are prime examples. Modern-day hospitals no longer are mere situses for medical services, as they once were, but instead are direct providers of medical care. *Sword v. NKC Hosp., Inc.*, 714 NE2d 142, 151 (Ind 1999) (so observing; citing other authorities). In that changed role, hospitals regularly employ "a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment[.]" *Bing*, 2 NY2d at 666. To ensure the quality of the medical services that they offer and provide, hospitals supervise and direct the general manner in which their

14

employees deliver medical services on their behalf through such means as "hiring criteria, training, formal practice guidelines, hierarchical supervision structures, peer review groups and disciplinary measures." *Harris v. Miller*, 335 NC 379, 390, 438 SE2d 731 (1994) (footnote omitted; citing authorities).[9] As a result, most jurisdictions now hold that an entity that *employs* a physician is subject to vicarious liability for that physician-employee's malpractice if the negligent act was committed in the course and scope of the employment. *See*, *e.g*, *Dias v. Brigham Med. Assoc., Inc.*, 438 Mass 317, 322-23, 780 NE2d 447 (2002) (applying traditional *respondeat superior* liability to employer of a physician; citing cases).[10]

---

[9] *Harris* involved the different, but related issue, of whether a hospital could be held vicariously liable for the negligence of a nurse surgical assistant as an employee of the hospital, or whether only the surgeon conducting the surgery (under the borrowed servant doctrine) could be so liable. Our court has addressed the same question and, in concluding that hospitals can be held liable in those circumstances, has similarly stressed the reality of modern-day hospitals and the control they can and do exercise over the delivery of medical services by their employees. *See May v. Broun*, 261 Or 28, 38, 492 P2d 776 (1972) (hospitals increasingly provide highly technical equipment operated by skilled professionals that the hospital hires and trains); *see also Holger v. Irish*, 316 Or 402, 410-13, 851 P2d 1122 (1993) (declining to adopt "captain of the ship" doctrine to impose vicarious liability on nonnegligent surgeon for negligence of nurse assistant; vicarious liability available only against hospital, which hired and trained nursing staff and billed for nursing services).

[10] This court's case law is in accord. *Giusti v. Weston Co.,* 165 Or 525, 529-31, 108 P2d 1010 (1941) (corporation authorized to do business as hospital association, which contractually agreed to provide medical services to high school football players, vicariously liable for negligence of physicians that corporation employed to provide those services). Only a few jurisdictions appear to be to the contrary. *See*, *e.g.*, *Hall v. Frankel*, 190 P3d 852, 861 (Colo 2008) (citing line of Colorado cases holding that hospitals and other corporations are not liable for employee-physicians because physicians are not subject to principal's right of control); *Tolman v. IHC Hosp., Inc.*, 637

15

A question left unanswered by those holdings has been whether a hospital or other entity can be held vicariously liable for a physician's malpractice on an *apparent agency* theory. The issue has arisen most commonly in circumstances where a hospital or other entity retains physicians as independent contractors, rather than as employees, and then offers and delivers medical services on its own behalf through those independent contractors. Most jurisdictions considering vicarious liability in that context have concluded that "liability for a doctor's negligence should be imputed to a [putative principal] when apparent authority, as defined in that jurisdiction, is established." *Estate of Cordero v. Christ Hosp.*, 403 NJ Super 306, 313, 958 A2d 101 (2008) (so observing in hospital context; citing representative cases); *see generally Kashishian v. Port*, 167 Wis 2d 24, 42-44, 481 NW2d 277 (1992) (characterizing vicarious liability for hospitals on apparent agency theory as a "growing trend"; citing cases). Drawing from familiar agency principles, courts typically have focused on two requirements as keys to imposing vicarious tort liability for a physician's malpractice on an apparent agency theory: first, whether the putative principal (such as a hospital) "held out" the physician as an employee or other agent to deliver medical services on the principal's behalf and subject to the principal's oversight or other control; second, whether the injured plaintiff reasonably relied on that holding out by looking to the principal as the provider of the care, and dealing with the physician as the principal's agent for that purpose. *See Sword*,

F Supp 682, 684 (D Utah 1986) (following Colorado authority).

16

714 NE2d at 150-51 (synthesizing hospital cases); *Petrovich v. Share Health Plan*, 296 Ill App 3d 849, 855-61, 696 NE2d 356 (1998) (using same two key considerations to determine vicarious liability of health maintenance organization for physician malpractice).

Cases involving hospitals have presented circumstances that most commonly have given rise to a basis for a finding of vicarious liability on an apparent agency theory. For the "holding out" element, the cases have "almost invariably" looked to the fact that modern-day hospitals are engaged in directly providing medical care and services, rather than merely providing a situs where medical professionals do so in furtherance of their individual medical practices. As part of their changed role as direct health care providers, hospitals are now run like businesses and promote themselves based on the superior quality of the health care they offer. *See*, *e.g.*, *Kashishian*, 167 Wis 2d at 41-44 (so observing; citing cases and authorities). To that end, hospitals pervasively engage in sophisticated advertising and public relations campaigns designed to compete with other facilities and providers, and to attract the patronage of the public in the communities that they serve. *Id.* at 38 (describing hospitals as spending "billions" to nurture their images as full care health facilities). Even without commercial advertising, hospitals cultivate "high visibility" in their communities to present themselves as "vital to community health" rather than as mere facilities in which private physicians practice their professions. *See Hannola v. City of Lakewood*, 68 Ohio App 2d 61, 66, 426 NE2d 1187 (1980) (describing how hospitals promote themselves as direct medical providers of quality care through fund-raising campaigns, community relations programs, public

17

service programs, press releases, and the like).  In effect, hospitals invite the public to rely on their competence in the delivery of at least certain kinds of health care services. Through that "holding out," a hospital cultivates an image that causes the public to assume, "correctly or not, that the hospital exerts some measure of control over the medical activities" integral to the hospital setting.  *Id.* at 66 (internal quotation marks omitted) (discussing emergency room services).[11]

With regard to the second element -- reasonable reliance -- the cases have focused on whether the plaintiff looked to and relied on the hospital as the direct provider of the medical services rendered.  The fact that the patient relies on the reputation of the hospital itself as a care provider, and does not make an "independent selection as to which physicians" the patient will obtain care from, provides the factual basis for the reliance needed for the apparent authority analysis.  *Pamperin*, 144 Wis 2d at 205-12 (internal quotation marks omitted) (discussing cases and so holding); *see also Estate of Cordero*, 403 NJ Super at 318-19 (canvassing cases and holding that reliance could be found based on fact that patient looked to hospital for care and physician was chosen by hospital).  Conversely, the mere fact that medical services are provided on a hospital's

---

[11]     *See also Kashishian*, 167 Wis 2d at 42-45 (extending principle to cardiology services; discussing applicability of principle outside emergency room context; citing cases); *Estate of Cordero*, 403 NJ Super at 316-17 (sufficient manifestation of control "when a hospital has established and staffed facilities or departments through which patients receive specialized care from medical professionals with whom they do not have a prior or ongoing relationship -- emergency rooms, operating rooms and anesthesiology and radiology departments").

premises is not enough to create vicarious liability. For example, if a patient seeks medical services from a physician who has staff privileges at a hospital and who uses the hospital merely as the situs for the physician's own medical practice, the necessary reliance on the hospital as a direct provider of care is lacking. *See Houghland v. Grant*, 119 NM 422, 428-29, 891 P2d 563 (1995) (comparing physicians who contract to provide services on behalf of hospital to physicians with staff privileges engaged in independent medical practices; citing cases).[12]

To be sure, vicarious liability for physician malpractice has not been limited to the hospital context; at least some courts have extended it to other entities as well, such as health maintenance organizations (HMO) and nonhospital patient treatment facilities. *See, e.g.*, *Boyd v. Albert Einstein Med. Ctr.*, 377 Pa Super 609, 616, 547 A2d 1229 (1988) (HMO); *Petrovich*, 296 Ill App 3d at 855 (HMO); *Malanowski v. Jabamoni*, 293 Ill App 3d 720, 727, 688 NE2d 732 (1997) (university outpatient center). The factual circumstances of those cases, however, have brought them well within the reasoning of the hospital line of authority.

*Boyd* is illustrative. There, the HMO had contractually committed to provide health care services and benefits to subscribers. It provided those services through a limited selection of primary physicians who were screened by the HMO and

---

[12]    Our own case law in that regard is in accord. *See Holland v. Eugene Hosp.*, 127 Or 256, 261-62, 270 P 784 (1928) (hospital not liable for physician's negligence where patient sought services directly from physician, paid physician, and physician had no relationship with hospital other than that of physician with staff privileges).

19

who had to comply with the HMO's rules; the HMO gave subscribers no choice of with whom to consult for specialist care. All fees for services were paid directly to the HMO, not to the physicians. The court in *Boyd* concluded that there was a factual question as to whether the physicians, although independent contractors, were apparent agents of the HMO because the patient in that case had submitted herself to the care of the physicians at the HMO's invitation and subject to significant apparent control on the HMO's part. *Boyd*, 377 Pa Super at 621. Other cases extending vicarious liability to entities other than hospitals have required similar representations by the entity, similar indicia of control by the entity, and similar reliance by the patient on the entity as the provider of medical care. *See*, *e.g.*, *George v. Fadiani*, 772 A2d 1065 (RI 2001) (factual question on apparent agency for dental services clinic where incorporated entity held itself out as a provider of dental services; selection of an appointment with specialist was done by clinic staff; billings were made on clinic stationary and through clinic staff; and clinic controlled compensation of dental providers).

In sum, the weight of authority in other jurisdictions is that, in a proper case, a hospital or other entity can be held vicariously liable for a physician's negligence on an apparent authority theory. We agree with those authorities.[13] We also agree on the

_____

[13] *See generally* John D. Hodson, Annotation, *Liability of Hospital or Sanitarium for Negligence of Physician or Surgeon*, 51 ALR4th 235 § 7 at 270-71, § 20 at 344-52 (1987) (collecting cases in which hospitals have been held vicariously liable for malpractice of physicians who were independent contractors and other nonagents on theory that hospitals contracted to provide medical services and had those services performed by physicians who had apparent authority to do so on the hospital's behalf).

20

essential touchstones for the imposition of vicarious liability in this context.  The key questions are:  (1) whether the putative principal held itself out, expressly or implicitly, as a direct provider of medical care so as to lead a reasonable person to conclude that the negligent actor who delivered the care was the principal's employee or agent in doing so; and (2) whether the plaintiff relied on those representations by looking to the putative principal, rather than to a specific physician, as the provider of the care, and not just as a situs in which a physician of the plaintiff's choosing provided the care.  *See*, *e.g.*, *Kashishian*, 167 Wis 2d at 44 (outlining elements); *Sword*, 714 NE2d at 150-51 (same).[14]

For many years, the Court of Appeals has effectively so held.  *E.g.*, *Jennison v. Providence St. Vincent Medical Center*, 174 Or App 219, 25 P3d 358 (2001); *Jones v. Salem Hosp.*, 93 Or App 252, 762 P2d 303 (1988); *Shepard v. Sisters of Providence*, 89 Or App 579, 750 P2d 500 (1988); *Themins v. Emanuel Lutheran*, 54 Or App 901, 637 P2d 155, *rev den*, 292 Or 568 (1981).  We have no occasion in this case to pass on the particular conclusions that the Court of Appeals reached on the records that those cases presented.  But we do agree with the general proposition that liability for physician negligence can, in the appropriate set of circumstances, be imputed to hospitals and other entities on an apparent authority theory.

[14]     The *Restatement (Second) of Agency* § 267 states a test for a principal's vicarious liability for an apparent agent's negligent conduct.  It provides:

> "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

The reference to "other agent" leaves unclear whether, consistently with section 250 of the *Restatement (Second) of Agency* (cited earlier), the principal must appear to have a right to control the manner in which the harm-causing act is performed, even if the apparent relationship is not that of master-servant.  As explained, under this court's decisions, vicarious liability for *physical torts* may be imputed to a principal outside the master-servant relationship only when that principal has an employer-like right to control

21

With that legal backdrop, we turn to the record in this case to assess whether, based on it, a jury could find the LLC vicariously liable for Borman's negligence. In arguing that a jury could do so, plaintiff's central thesis is that the LLC, through various actions and inactions, promoted itself as a group medical entity and thereby assumed responsibility for the negligence of the medical providers that appeared to be a part of that entity. Plaintiff relies on the fact that the LLC placed signage on the building, designating it the Willamette Spine Center and using the WSC logo. Plaintiff likewise relies on the fact the individual medical practitioners in the building used business cards that included, either at the top of the cards or as part of the address for their offices, the words Willamette Spine Center and the WSC logo. In that regard, plaintiff acknowledges that the LLC did not require the tenants to use the building name or logo. But plaintiff contends that the LLC acquiesced in their use of the name and logo and, by doing so, contributed to the perception that Willamette Spine Center was an entity in the business of delivering medical services, and not just a building that housed medical providers engaged in independent practices.

Finally, plaintiff relies on the fact that Freeman referred to Willamette

---

the agent's (the nonservant agent's) injury-causing conduct. Section 267 is not specifically directed to the physical tort context. But it is in general accord with the test that we announce in this case if, in the context of vicarious liability for tortious conduct, it extends only to apparent agents who either are apparent employees or over whom the principal, through representations traceable to the principal, appears to exercise control or oversight over the injury-causing conduct. *See* __ Or at __ n 8 (slip op at 13 n 8).

Spine Center as "his clinic" and to Borman as a "Willamette Spine Center surgeon." Plaintiff contends that, because Freeman was an owner/member of the LLC landlord of the building, Freeman's representations were those of the LLC itself, not of Freeman as a chiropractor, or at least a jury could so conclude. Taken together, plaintiff argues, the circumstances reasonably led plaintiff to believe that he was seeking treatment from an entity -- "the" Willamette Spine Center -- rather than from independent medical providers whose practices were in that building.[15]

We disagree that the record in this case provides a sufficient basis to conclude that the LLC held itself out as a medical entity that was itself a provider of medical services that it delivered through agents, such as Borman, who were subject to the LLC's control. On the record before us, the LLC's role was typical of a landlord of a professional office building. As a landlord, the LLC developed the building for use as

---

[15]     Plaintiff relies on other representations as well, but they are ones that plaintiff did not show that he ever saw or relied on, or did not show to be traceable to the LLC, or both. For example, plaintiff points to an Internet advertisement by two chiropractors who had offices in the Willamette Spine Center building, which is undated, which plaintiff never claimed to have seen, and which the LLC was not shown to have had any involvement in posting. Plaintiff also relies on an Internet homepage with the heading "Willamette Spine Center" and the "WSC" logo that was dated May 2006 (two-and-a-half years after Borman negligently performed surgery on plaintiff), which plaintiff also did not claim to have seen or relied on, and which the LLC was not shown to have known about or have created. We agree with the Court of Appeals that any representations not traceable to the LLC and not relied on by plaintiff cannot be a basis for holding the LLC liable for Borman's negligence. *See Eads*, 234 Or App at 334 (disregarding that evidence because it did not relate to "conduct by defendant holding Borman out as its agent" where no evidence indicated that defendant authorized those representations or had knowledge that they were made).

23

medical office space and leased the offices inside specifically to medical providers with specialties related to spinal care. The LLC then denominated the building "Willamette Spine Center" with signage and a logo. In doing so, the LLC did what is customary and usual for a landlord of a professional office building -- it leased space to professionals with the same or related specialties (doctors, dentists, lawyers, engineers, architects, among others) in a single office building and gave the structure a "trade" name, one that is descriptive and memorable for purposes of marketing and promoting the practices of the professionals who have offices there. *See*, *e.g.*, *Slavik v. Parkway Hosp.*, 661 NYS2d 274, 275 (1997) (leasing corporation used trade name "Corona Medical & Dental Center" for office building housing independent medical and other health professionals); *Hylton v. Flushing Hosp. and Med. Ctr.*, 630 NYS2d 748, 749 (1995) (owner of building leased to individual medical and dental practitioners used signage "Medical and Dental Services" on awning of building). At best for plaintiff, so denominating the building reasonably could convey to a third party that the practitioners in the building were associated in some way with one another. It could not reasonably convey that the building housed an entity that directly provided medical services and that the practitioners in the building were the entity's employees or subject to the entity's oversight, direction, or control. As the court observed in *Hylton*, to conclude that use of professional building trade names can create an apparent agency relationship between professional providers and the landlords of such buildings "would expose to liability for medical malpractice every landlord with the word 'medical' appearing on its premises." 630 NYS2d at 750. The legal principles that apply here are not so lax.

24

The other LLC representations on which plaintiff relies, both alone and in combination, similarly conveyed at most some form of association or affiliation among the tenants, not a principal-agency relationship with the requisite right of control on the part of the LLC. As plaintiff argues, the tenants used the building name and logo on their business cards, and the LLC reasonably should have expected that they would do so.[16] But such use by the tenants suggested no particular relationship between the building occupants beyond an affiliation or association of some kind. That is particularly so given that, here, each provider had his or her own individual contact information on the card as well, such as telephone numbers and e-mail addresses. Also, the LLC listed each provider's individual name on the door into the building; several of the providers were LLCs themselves and included that designation in their names, necessarily indicating their separate legal and business existence. The business cards, in combination with the individual names listed at the entrance to the building, reasonably communicated the independence of the individual providers, not that they were agents of some other entity subject to that entity's right of control.

Plaintiff nevertheless urges that he reasonably perceived that he was dealing with a single entity (*i.e.*, a single "group medical practice") because Freeman

---

[16] When a landlord gives a building a distinctive trade name to communicate something about the businesses of the tenants, a landlord reasonably should expect the tenants to make some use of that trade name on business cards or other marketing materials. For that reason, we conclude, contrary to the LLC's position, that a jury would be entitled to find that the use of the building name and logo on tenant business cards was traceable to the LLC.

25

once referred to "his clinic, the Willamette Spine Center" and also referred to Borman as a "Willamette Spine Center surgeon."  The parties disagree whether those two statements by Freeman are attributable to the LLC given, on the one hand, Freeman's status as one of the LLC members and, on the other, the fact that plaintiff knew nothing about the existence of the LLC or Freeman's role in it, and Freeman made the statements in the only capacity that plaintiff knew Freeman to have -- as a chiropractor.  We need not, however, resolve that disagreement.[17]  At best for plaintiff, Freeman's isolated oral

[17]    The parties provide no developed legal analysis as to whether Freeman's status as an LLC member means that his statements to a patient in a social setting or in his chiropractic practice are attributable to the LLC.  In terms of Freeman's *actual* authority to bind the LLC by his statements, the record is not sufficiently developed for us to determine the issue, one way or the other (a deficiency that hurts plaintiff).  The full operating agreement is not in evidence, and we do not know how the LLC was structured or what limitations may have been placed on the authority of its members or manager. *See* ORS 63.140(1)(a) (member of member-managed LLC is agent of LLC for purposes of LLC's business unless authority to act for LLC in a particular matter is limited); ORS 63.140(2)(a) (member of manager-managed LLC is not agent of LLC for purpose of its business solely by reason of being LLC member).

To the extent plaintiff's theory is that Freeman had apparent authority to bind the LLC, that proposition poses a host of potential issues.  Plaintiff dealt with Freeman only as a chiropractor.  Nothing in the record suggests that plaintiff knew that the LLC existed or that Freeman was a member of it.  Given that context, a key statement on which plaintiff relies (Freeman's one reference to Willamette Spine Center as "his" clinic) reasonably conveyed *at most* an individual and personal-to-Freeman interest or role in the association of practitioners in the building.  The parties do not adequately explore whether such a statement by an LLC member can be attributed to the LLC, and we decline to resolve that question. *See generally So. Seattle Auto Auction, Inc. v. Ladd*, 230 Or 350, 361-62, 370 P2d 630 (1962) (one who deals with agent as principal can look only to agent for relief; no apparent authority can arise to bind principal); *Water, Waste & Land, Inc. v. Lanham*, 955 P2d 997 (Colo 1998) (agency principles pertaining to undisclosed and partially disclosed principals apply to LLC; party who deals with LLC member without knowing LLC exists or knowing LLC's identity can look to only

statements reasonably might create or reinforce a perception that the medical practitioners in the building were affiliated with each other. His statements bear no comparison, however, to the kind of representations that have led to entity liability for medical malpractice on an apparent agency theory for hospitals or other medical providers.[18] That is, Freeman's statements reasonably could not have been understood, either explicitly or implicitly, to hold out Willamette Spine Center as an entity that was a *direct* provider of health care, the quality of which Willamette Spine Center as a discrete entity oversaw and controlled.

Plaintiff's case also fails on the second key element for vicarious liability on an apparent agency theory -- whether the plaintiff actually and reasonably relied on the LLC's representations by looking to Willamette Spine Center as an entity (real or reasonably perceived), rather than to a specific professional, for his care. By plaintiff's own account, he began treatment with Freeman because he and Freeman had met in the coffee shop in which plaintiff worked. Plaintiff knew that Freeman was a chiropractor and was "affiliated" with Willamette Spine Center. He chose to treat with Freeman

individual member, not LLC).

[18]    We have identified no case -- and plaintiff cites none -- with facts analogous to these in which a court has found a basis for vicarious liability. The few disclosed by our research are, instead, uniformly to the contrary. *See*, *e.g.*, *Vanstelle v. Macaskill*, 255 Mich App 1, 662 NW2d 41 (2003) (insufficient representation by hospital of control over physician's practice to hold hospital landlord vicariously liable for physician who practiced in leased space in office building owned by hospital and who had staff privileges at hospital); *Slavik*, 661 NYS2d at 275 (no liability for leasing corporation based on use of trade name "Corona Medical & Dental Center" for office building); *Hylton*, 630 NYS2d at 749-50 (similar).

27

"based on [their] acquaintance." Plaintiff did not describe having otherwise heard of or known anything about Willamette Spine Center. He did not describe wanting to obtain treatment through that perceived entity, regardless of the individual who delivered that care. The only conclusion that plaintiff's testimony supports is that Freeman's association with Willamette Spine Center was happenstance in terms of plaintiff's reliance; it was plaintiff's personal relationship with Freeman that led him to be treated by practitioners in that building.

No evidence thus supports a conclusion that, subjectively, plaintiff relied on the signage or any other representation by the LLC to believe that the LLC was itself a medical provider. Even if plaintiff had done so, however, that reliance would not have been reasonable. A key distinction between this case and other cases in which courts have found a basis for vicarious liability is that here, unlike in those cases, there was no actual entity (*e.g.*, a hospital, an outpatient clinic) with which plaintiff dealt, or could have dealt. Inside the building denominated "Willamette Spine Center," all appearances were that the practitioners were independent medical providers. There was no common staff or even a common receptionist. Each medical provider in the building had his or her own office, own professional staff, and own exam and waiting rooms (although some, such as Borman and Tiley, shared certain limited spaces). Each medical provider used his or her own forms and billed to his or her own accounts for his or her services. Each had unique contact information, including phone numbers and e-mail addresses. The record suggests no means for plaintiff, or any other third party, to have contacted "Willamette Spine Center" as an entity or to deal with it as an entity, had plaintiff or

28

anyone else tried. There was no phone number to call, no address or e-mail for correspondence, no receptionist to talk to, and no one in charge who oversaw the delivery of medical services and whom a patient could approach with question or complaints.

In consulting with Borman, plaintiff dealt with Borman as the independent provider that he was. By plaintiff's own description, Freeman "referred" him to Borman. Borman's name, along with those of all the other building tenants, was listed on the outside of the building, near the door. Borman had his own office, his own phone number and e-mail address, and his own staff. He shared common areas (exam rooms, waiting rooms) with only one other physician. Billings for his services were payable to his own accounts. His letterhead and patient forms had only his own name on them. To be seen by Borman, plaintiff had to fill out a new patient medical history. Borman performed surgery at a local hospital, not in the building where he had his office.

In short, plaintiff was led to Borman because of his personal relationship with Freeman, who had referred plaintiff to Borman in the same way that any medical professional customarily refers patients to a specialist. He was not seeking treatment by a nonexistent entity ("Willamette Spine Center"), which in turn assigned him to or otherwise controlled his selection of surgeons. Indeed, no reasonable person in plaintiff's position could conclude that Willamette Spine Center, as an entity, was in the business of surgery or of overseeing the performance of any surgeon housed in the building, given that plaintiff's surgery was not performed in that building, but was instead performed at a local hospital. Plaintiff's belief that Borman was a "Willamette Spine Center surgeon" was objectively reasonable only to the extent that plaintiff understood Borman to be an

29

independent medical professional who associated with related specialists by having his practice in a common office building and by referring patients, as appropriate, to other practitioners in the building. To whatever extent plaintiff subjectively believed Borman to be an employee or other agent under the control of an entity (Willamette Spine Center) that was a direct provider of medical services -- something plaintiff did not say he believed -- that belief was unreasonable in these circumstances.

For those reasons, we conclude that the record is inadequate to permit a jury to hold the LLC liable for Borman's negligent surgery on the theory that Borman was the apparent agent of the LLC. Contrary to plaintiff's position, to impose liability on the LLC in this circumstance, it is not enough that the LLC contributed to the appearance that the medical practitioners in its building were affiliated in some way with each other and made beneficial referrals to each other. Rather, for the LLC to be liable for the medical malpractice of the professionals in the building, plaintiff had to look to the LLC, not individual medical providers, for his treatment, including the surgery that Borman performed. Plaintiff would have had to have dealt with Borman based on a reasonable belief, traceable to the LLC, that Borman was the LLC's employee or was otherwise subject to the LLC's right of control in performing that surgery. The facts and circumstances presented on this record would not permit a jury to so conclude. Consequently, the trial court correctly granted the LLC's motion for summary judgment.

The decision of the Court of Appeals and the judgment of the trial court are affirmed.

30

**DE MUNIZ, C. J.,** specially concurring.

I concur in the majority's evaluation that the record in this case is inadequate to permit a reasonable jury to conclude that defendant Willamette Spine Center, LLC held out Dr. Borman to plaintiff as its agent for the delivery of medical services. I do so because plaintiff has failed to present sufficient evidence that it was defendant -- and not some other party -- that was responsible for misleading plaintiff as to the affiliations of the providers at the "Willamette Spine Center." However, the majority also concludes that, even if plaintiff had established defendant's responsibility for the conduct alleged, no reasonable jury could find that plaintiff actually or reasonably relied on that conduct to infer that the Willamette Spine Center was a group medical clinic. In my view, that second holding is both incorrect and unnecessary to decide in this case. I write separately to express my view that the record in this case is sufficient for a reasonable jury to find that *someone* is holding out the individual providers in the Willamette Spine Center building as agents of a unified group medical clinic providing an array of medical services, in a manner that, upon proper proof of the identity of the principal, is sufficient to create a factual question about the principal's vicarious liability for Borman's malpractice.

In this case, the record shows that Dr. Freeman[1] invited plaintiff to seek

---

[1] The record reflects that Freeman was both a member of the defendant LLC and a chiropractor who practiced in the Willamette Spine Center building. On at least one occasion (in a biographical paragraph of an academic article he authored), Freeman also identified himself as the "co-medical director of Willamette Spine Center."

1

care at "his clinic, the Willamette Spine Center," both from Freeman himself and from another provider at the clinic. When that initial care proved ineffective, Freeman sent plaintiff to a third provider practicing on the premises, Borman, who Freeman referred to as "one of the Willamette Spine Center surgeons."[2] The building in which those providers worked was prominently labeled as the "Willamette Spine Center" on the façade of the building itself, as well as on a sign in front of the building, which also featured a distinctive logo comprised of the letters "WSC," with the letter "S" slightly enlarged and stylized to suggest a spine. A list of all of the tenants in the building, which included the names of both individual providers and providers operating as LLCs, was inscribed on the glass next to the front entrance to the building. Inside the building, although there was no centralized receptionist, staff, or waiting room, some of the providers, including Borman, shared space and staff with other providers at the facility. All of the providers in the building used business cards with the same stylized logo that appeared on the sign in front of the building, with the words "Willamette Spine Center" prominently displayed above (and in a larger font than) the provider's own name.

The record also reflects that the Willamette Spine Center name and logo were used in public advertisements in a manner that strongly suggested the existence of a single, unified entity providing a broad range of medical services. A web page, once

---

[2] The record shows that Freeman not only recommended that plaintiff see Borman, but personally arranged the details of plaintiff's appointment and then called plaintiff and told him when to come in.

located at www.willamettespinecenter.com, prominently featured the name and logo described above and proclaimed that:

"Willamette Spine Center was developed from a desire to provide comprehensive spinal care and pain management services, equipped with state of the art equipment, dedicated physicians who are expert in the practice, and knowledgeable staff committed to serving the needs of the patients. The patients served by the Willamette Spine Center are individuals with both spinal and pain disorders. The center utilized all of its medical providers as a multidisciplinary team to assure patients receive the services they need from the onset of the disease process to the completion of a rehabilitative program. We have contracts with most major insurance carriers and work regularly with attorneys to meet the financial needs of our patients."

In addition, an internet telephone directory advertisement, also using the Willamette Spine Center name and stylized logo, described the center as a "Comprehensive Diagnostic Facility offering: Chiropractic[,] X-Ray, MRI & CT Scans[,] Precision Spine Injection, Diagnostic & Treatment[,] Spine Surgery[, and] Physical Therapy," and set out a list of medical practitioners under the heading "WSC Providers."[3]

I agree with the majority to the extent that it holds that no reasonable jury

---

[3] The majority disregards those advertisements on the grounds that plaintiff failed to establish that defendant authored the ads, that the ads existed at or before the time plaintiff was injured, or that plaintiff saw the ads prior to his operations. Although I agree that there is insufficient evidence for a reasonable jury to attribute the ads to defendant or find that plaintiff relied on the ads, I find the evidence relevant to show that whoever authored the ads *intended* for potential patients to view the Willamette Spine Center as a unified group medical practice, both at the time that plaintiff's attorneys accessed the web page for the purposes of this litigation, and, according to the web page, at the time that entity "was developed." Even if plaintiff did not personally witness every indication of the principal's intent, that intent is relevant to the question of whether it was objectively reasonable for plaintiff to rely on other evidence of which he did have knowledge.

3

could find, on the basis of that evidence, that defendant Willamette Spine Center, LLC held out Borman as its agent for the delivery of medical services. The only evidence in the record with regard to the actions of the LLC itself shows that the LLC leased the Willamette Spine Center building from another entity, subleased portions of that building to the various providers who practiced there, and collected rent from those tenants. Although the LLC controlled the building's signage under the leases, there is no evidence that the LLC designed or erected the signs on its own account or for its own benefit rather than at the behest of its tenants. Likewise, there is no evidence that the LLC issued or approved of the providers' business cards or placed the advertisements described above. As to Freeman's statements and conduct, although plaintiff presented evidence that Freeman was a member of the LLC, that evidence alone is insufficient to attribute his actions to the LLC. *See* __ Or at __ n 17 (slip op at 26 n 17) (discussing the lack of evidence establishing Freeman's authority to bind the LLC). For those reasons, I agree with the majority in affirming the trial court's order granting summary judgment to defendant in this case.

I part ways with the majority, however, to the extent that it holds that, even if plaintiff had established that the LLC had engaged in those acts, that evidence nonetheless would have been insufficient to permit a reasonable jury to hold the LLC vicariously liable for Borman's malpractice under the doctrine of apparent authority. Drawing all reasonable inferences in favor of plaintiff, as we must, I would hold that a reasonable jury could conclude from the above facts that *someone* was holding out Borman as an agent of the Willamette Spine Center in a manner that could subject the

4

person or persons responsible for creating that impression to vicarious liability for his malpractice. In straining to find otherwise, the majority improperly fails to consider the evidence in the light most favorable to plaintiff. *See* ORCP 47 C (permitting the court to grant summary judgment only if, "based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party"). For instance, the majority holds that a jury could not reasonably find that the use of the Willamette Spine Center name and logo on the providers' business cards implied a group medical practice, reasoning that the business cards "reasonably communicated the independence of the individual providers" because "each provider had his or her own individual contact information on the card as well, such as telephone numbers and e-mail addresses." __ Or at __ (slip op at 25). However, while a reasonable jury *could* find that the lack of a central e-mail address or telephone number implied the providers' independence, that is by no means the *only* reasonable inference a jury could draw from that evidence. A competing inference -- and one more favorable to plaintiff -- is that those providers carried on a group practice in the form of an entity represented by that name and logo, and perhaps simply chose not to share a central phone line or e-mail address or include that information on their individual cards. Business cards routinely include individual contact information, even when an individual is employed by or affiliated with a larger entity. The inclusion of that information on Borman's card does not, in my view, render unreasonable any other inference more favorable to plaintiff that the providers' use of the Willamette Spine Center name and logo might suggest.

5

Similarly, the majority holds that the list of provider names next to the front door of the building could not reasonably be interpreted to suggest a group practice, because the providers were listed individually and, in some cases, designated as LLCs. Again, however, while a jury *could* interpret that evidence to indicate that the providers were independent, an equally plausible interpretation -- and one more favorable to plaintiff -- is that the names were listed together in that central location because the providers were affiliated with one another in a group medical practice. The designation of some of the providers as LLCs does not entirely discredit that inference: LLCs can affiliate with other entities in corporate forms just as natural persons can. *See* ORS 63.077(2)(g) (permitting an LLC to "[b]e a promoter, incorporator, general partner, limited partner, member, associate or manager of any partnership, joint venture, trust or other entity"). Indeed, the fact that some of those LLCs actually incorporated the designation "Willamette Spine Center" into their names could imply to a reasonable person a legally significant affiliation with the clinic.

But for the lack of nexus between those culpable actions and the actions shown to be attributable to defendant here, I would hold that the issue of whether apparent authority existed in this case should be submitted to a jury for resolution under appropriate instructions. In my view, the majority's unnecessary commentary on that issue improperly fails to draw all reasonable inferences in favor of plaintiff and sets an ill-advised precedent for future courts faced with similar cases.

To compound the problems created by the majority's erroneous treatment of the facts, the majority also errs in stating that, to establish vicarious liability for a

6

nonemployee agent's physical conduct, the principal must appear to have a right to control the physical details of the manner of performance that is characteristic of an employee-employer relationship. ___ Or at ___ (slip op at 11-12). That statement is incorrect. Oregon law does not require a principal to appear to have a right to control the details of the manner of performance by an apparent agent.

The *Restatement (Third) of Agency* § 2.03 (2006), provides:

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."

The *Restatement (Second) of Agency* § 267 (1958), provides:

"One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

The majority quotes those sources but does not apply the test that they describe. ___ Or at ___ (slip op at 9 n 5; 11-12; 20 n 13). Instead the majority declares the latter provision imposes specific right-to-control requirements that the provision does not contain. That is a mistake. The majority should not bury its statement in a footnote or claim that this court's case law agrees with the majority's mistaken view.

There is no unclarity in the above-quoted *Restatement* provisions, and no Oregon case adopts the majority's construction. The *Restatement* provisions correctly address the legal standard for determining the liability of a principal for the lack of due care of an apparent agent without any reference to a proof requirement concerning the

7

principal's right to control the details of the tortious conduct of the apparent agent. That is so because apparent authority requires a showing, consistent with section 2.03, of a reasonable belief, traceable to the principal's own conduct, that the apparent agent has authority to act in the matter in question on behalf of the principal, thus leading the tort victim to rely justifiably, as section 267 provides, on the care or skill of the apparent agent as if that person were expressly authorized to act by the principal.

Later in its opinion, the majority sets out the legal standard for determining the vicarious liability of a principal in medical malpractice cases against healthcare entities.[4] The holding in this case turns on that standard and on the *Restatement* provisions quoted above, not on the majority's erroneous statements, already discussed, concerning a principal's vicarious liability for an apparent agent's tortious conduct. The majority errs in failing to give effect to the full scope of the rules of apparent authority that the *Restatement* provisions quoted above express.

The medical care industry has undergone vast structural changes in the last few decades. The independent physician who contracts for privileges at the local hospital or makes house calls to provide care for his roster of loyal patients is largely a relic of a bygone era. Modern medical care increasingly is being provided instead by doctors employed by or affiliated with HMOs, insurance companies, and hospitals, as a

---

[4] ___ Or at __ (slip op at 12-14). The point of that standard is that the patient looks to the entity as the provider of healthcare, and not only to the doctor who performs the medical services.

8

manifestation of the increasing dependence of the medical practice on institutional resources and expertise. *See generally* William M. Sage, *Enterprise Liability and the Emerging Managed Health Care System*, 60 Law & Contemp Probs 159 (1997). The dwindling number of doctors not beholden to those entities is increasingly turning to alternative arrangements like group practices, clinics, and professional corporations -- in part for the purpose of managing the ever-increasing costs of malpractice liability to persons like plaintiff here. *Id.* In turn, it is unsurprising that patients would look to those entities to provide medically appropriate services. In my view, the changing nature and prevalence of those relationships is highly relevant to the issue of what plaintiff could and could not reasonably have assumed about the structure of the particular relationships at issue in this case. It is imperative that the law recognize and accommodate the changing nature of the delivery of medical services in this state.

For the reasons I have set out, I specially concur in the decision of the court.

Durham and Walters, JJ., join this opinion.