Argued and submitted March 8, 2018, reversed and remanded May 28, petitions for review denied October 1, 2020 (367 Or 115)

Gail TOWNER,
an Oregon resident,
*Plaintiff-Appellant,*

*v.*

Peter A. BERNARDO, M.D.,
an Oregon resident,
*Defendant-Respondent.*

Marion County Circuit Court
12C21665

Gail TOWNER,
an Oregon resident,
*Plaintiff-Appellant,*

*v.*

SILVERTON HEALTH,
dba Silverton Hospital, an Oregon Corporation,
*Defendant-Respondent,*

*and*

Cynthia Lynn HOWARD, CRNA,
*Defendant.*

Marion County Circuit Court
13C17343

A161012

467 P3d 17

In this medical malpractice action, plaintiff appeals from limited judgments dismissing her claims against defendant Silverton Hospital. Plaintiff alleged that Dr. Peter Bernardo negligently performed surgery on her at Silverton Hospital and that Silverton Hospital was directly and vicariously liable for its own negligence and Bernardo's negligence, respectively. Plaintiff assigns error to (1) the trial court's grant of Silverton Hospital's motion to strike her allegation that Silverton Hospital had a nondelegable duty to provide quality care within its facility under ORS 441.055; (2) the court's dismissal, under ORCP 21 A(8), of plaintiff's claim that Silverton Hospital was negligent in "credentialing," hiring, retaining, and supervising Bernardo by giving him privileges at Silverton Hospital and allowing him to perform surgical procedures there; and (3) the court's grant of summary judgment in favor of Silverton Hospital upon concluding that Silverton Hospital was not vicariously liable for Bernardo's negligence because Bernardo was not the hospital's actual or apparent agent. *Held*: The Court of Appeals concluded that (1) the court did not err in striking plaintiff's

allegation that Silverton Hospital had a nondelegable duty to ensure adequate patient care, because ORS 441.055 does not impose such a duty; (2) the court erred in dismissing plaintiff's claim that Silverton Hospital was negligent in "credentialing," hiring, retaining, and supervising Bernardo because Silverton Hospital did not show, on the face of the complaint, that documents and information necessary to Silverton Hospital's defense was protected by the peer review privilege under ORS 41.675(3); and (3) the court erred, in part, in granting summary judgment to Silverton Hospital, because a reasonable juror could conclude that Bernardo was Silverton Hospital's apparent agent.

Reversed and remanded.

Dale Penn, Judge.

Brent Barton argued the cause for appellant. On the opening brief was Travis Eiva. Also on the reply brief was Travis Eiva.

Michael J. Estok argued the cause for respondent Silverton Health. Also on the brief were James L. Dumas and Lindsay Hart, LLP.

Lindsey H. Hughes, Hillary A. Taylor, and Keating Jones Hughes, P.C., filed the brief for respondent Peter A. Bernardo, M.D.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

Plaintiff Gail Towner appeals from the limited judgments dismissing her medical malpractice claims against defendant Silverton Health, dba Silverton Hospital. Plaintiff alleged that defendant Dr. Peter Bernardo negligently performed laparoscopic surgery on her at Silverton Hospital.[1] Plaintiff alleged that the hospital had direct and vicarious liability for its own negligence and Bernardo's negligence, respectively. Plaintiff challenges the trial court's rulings as to Silverton Hospital, and we address three of her four assignments of error.[2]

In plaintiff's first assignment, she contends that the trial court erred in granting defendant's motion to strike the allegation asserting that Silverton Hospital had a nondelegable duty to provide quality care within its facility under ORS 441.055 and is therefore directly and vicariously liable for Bernardo's negligent conduct. We conclude that the trial court did not err as to that ruling. In plaintiff's second assignment, she contends that the court erred in dismissing, under ORCP 21 A(8), her allegations that Silverton Hospital was negligent in "credentialing," hiring, retaining, and supervising Bernardo by giving him privileges at Silverton Hospital and allowing him to perform surgical procedures there. We conclude that the court erred in dismissing that allegation. In her third assignment, plaintiff contends that

---

[1] The trial court consolidated plaintiff's two cases, Case No. 12C21665 and Case No. 13C17343, and appears to have issued identical limited judgments in those cases. Plaintiff appeals both limited judgments. The limited judgments dismiss only plaintiff's claims against defendant Silverton Health. Defendant Bernardo, although initially not a party to this appeal, filed a notice of intent to participate as a party under ORAP 2.25(3) and then filed a brief addressing limited issues that we do not need to reach.

[2] In her final assignment of error, plaintiff challenges the denial of her motion to compel production of medical records related to other patients that Bernardo had "injured in similar surgeries." Plaintiff argues that "the documents were relevant to prove that defendant hospital was negligent in allowing Bernardo privileges to perform surgery on patients." As we discuss below, the trial court dismissed the claim related to that allegation, which it referred to as a "negligent credentialing claim," but we reverse that ruling. The hospital contends that, even if we reverse the trial court's dismissal, as we do, we should "refrain from considering the merits of the motion [to compel] at this juncture." It suggests that the trial court can revisit any further motion to compel on remand. We agree that we do not need to address this issue and that a future motion to compel, if any, may be addressed on remand.

the court erred in granting summary judgment in favor of Silverton Hospital upon concluding that, because Bernardo was not the actual or apparent agent of the hospital, it was not vicariously liable for Bernardo's negligence. We conclude that there is evidence from which a reasonable juror could find that Bernardo was an apparent agent of Silverton Hospital and that, therefore, the hospital could be vicariously liable for Bernardo's alleged negligence. However, we conclude that, on this record, Bernardo was not an actual agent of Silverton Hospital as a matter of law and, therefore, Silverton Hospital cannot be vicariously liable on that basis. We reverse the limited judgments and remand to the trial court for further proceedings consistent with this opinion.

## I.   VICARIOUS LIABILITY:
## ACTUAL AND APPARENT AGENCY

We start by addressing plaintiff's third assignment of error challenging the trial court's grant of summary judgment. Plaintiff filed her complaint against Silverton Hospital claiming that Bernardo negligently performed surgery on her at the hospital. Plaintiff further alleged that Bernardo was the hospital's actual or apparent agent, and, therefore, the hospital was vicariously liable for Bernardo's negligence. Silverton Hospital moved for summary judgment, contending that it could not be vicariously liable as a matter of law under either an actual or apparent agency theory. The court agreed with the arguments presented by the hospital and explained that it "would grant summary judgment on the motion on both of the [theories], actual agency and apparent agency and enter judgment for Silverton Health based upon that."

We review a trial court's grant of summary judgment for legal error, and we will affirm if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Balzer v. Moore*, 293 Or App 157, 159, 427 P3d 193, *rev den*, 363 Or 817 (2018). There is "[n]o genuine issue as to a material fact" when "no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. In determining whether the court erred in granting summary judgment,

"we view the facts and all reasonable inferences that may be drawn from them in the light most favorable to the non-moving party—in this case, plaintiff." *Eads v. Borman*, 234 Or App 324, 326, 227 P3d 826 (2010), *aff'd*, 351 Or 729, 277 P3d 503 (2012) (*Eads I*). With that standard in mind, we state the following facts.

A.   *Factual Background*

In October 2011, plaintiff began experiencing severe abdominal pain. She consulted her primary care physician, who tentatively diagnosed plaintiff with diverticulitis and advised her to seek emergency care. Plaintiff lived near Silverton Hospital and had brought her children there for medical care. Silverton Hospital advertised its services to the community, including by mailing marketing materials to local home addresses and posting advertisements in local newspapers. It consistently advertised its emergency and surgical services. In some advertisements, it touted the quality of "our Specialist Centers and medical staff" and represented that it "provides" medical services to the community. Others informed the public that Silverton Hospital offers a "Specialist Center" as well as "General Surgery" services. At least one advertisement included a photograph of Bernardo with a caption advertising "GENERAL/VASCULAR SURGERY" and other text that referenced "the professionals that comprise the Silverton Hospital Network" and "[o]ur specialty medical professionals." Silverton Hospital's website also listed Bernardo on the webpage describing the hospital's "Surgical Services" along with the message that "it is possible for area residents to stay close to home" for surgical services.

When she arrived at Silverton Hospital, an emergency room doctor evaluated plaintiff. That doctor admitted plaintiff to the hospital and contacted Bernardo, who was "on call" to evaluate possible surgical cases in the emergency room. Bernardo was licensed to practice medicine in Oregon and had his own private surgical practice. He had been granted staff privileges at a number of health care facilities, including Silverton Hospital. Those privileges allowed Bernardo to practice medicine at Silverton Hospital and

subjected Bernardo to its peer review process, but Bernardo was not a Silverton Hospital employee.

As a condition of maintaining privileges at Silverton Hospital, Bernardo had agreed to follow the hospital's medical staff bylaws, which describe the nature of the duties owed by each member of the medical staff—whether employed by Silverton Hospital or an independent physician with privileges. Under the bylaws, active members of the medical staff were required to be "on call" to the Emergency Department at Silverton Hospital. Silverton Hospital paid "on call" doctors a flat rate for each " call shift" to which they responded. Apart from that flat fee, it did not pay Bernardo a salary or otherwise contribute to or support Bernardo's private medical practice. Under the bylaws, the hospital did not supervise or facilitate any doctor-patient relationship that continued between an "on call" doctor with privileges and his or her patient after that patient was discharged from the hospital. Those patients were free to continue to seek future services from the doctor in an independent capacity.

Without plaintiff's input, Silverton Hospital assigned Bernardo to plaintiff's case. Bernardo met plaintiff for the first time in her hospital room. Bernardo explained that he was the surgeon who would care for her. He explained her diagnosis—diverticulitis—and advised her that he was keeping her in the hospital overnight for observation. Bernardo saw plaintiff again in the hospital the next day. He explained that her condition had not improved and that she would likely need surgery, namely, a laparoscopic colectomy. Bernardo arranged with plaintiff to follow up with him at his office across the street from Silverton Hospital.

After the hospital's emergency room staff had admitted plaintiff to the hospital, Bernardo was the only doctor who discussed plaintiff's case with her during the three days she spent there. Nurses and other hospital staff cared for plaintiff as well. Some of those individuals vouched for Bernardo. One nurse told plaintiff and her husband that Bernardo was "a great doctor." A nurse—it is unclear if it was the same nurse—told plaintiff's husband that Bernardo was "one of our best."

On Bernardo's recommendation, plaintiff scheduled an appointment with Bernardo to discuss her surgery. She was later contacted by a member of Bernardo's staff and told that the visit would be at Bernardo's Salem-area office because he no longer maintained his office across from Silverton Hospital. Plaintiff traveled to Salem for her appointment. She met with Bernardo at his personal office, where nothing indicated that Silverton Hospital managed or was otherwise involved with Bernardo's practice. Plaintiff filled out paperwork at Bernardo's office, including a patient agreement, which similarly did not reference Silverton Hospital.

Plaintiff decided to have Bernardo perform the surgery at Silverton Hospital. Plaintiff chose the hospital because it was close to her home and because she "had faith in [Silverton]" and "had decent experiences with them." Prior to her surgery, plaintiff signed paperwork provided by the hospital, which included a general clause that "some" care providers who offer services at Silverton Hospital are not employed by the hospital, without naming any providers.

We quote below at some length plaintiff's deposition transcript regarding her understanding of Bernardo's role at Silverton Health prior to her surgery because we conclude that these facts are significant to our analysis. Plaintiff's answers are not always clear, but do provide an overall picture regarding her knowledge and reliance on Silverton Hospital's express and implied representations:

"Q   On [the date of the surgery] when you walked into the hospital did you believe that Dr. Bernardo was an employee of Silverton Health?

"A   I did.

"Q   And why did you believe that?

"A   Because I saw him there, because he treated me there, because of the picture on the wall, very large picture that stated Chief of Surgery led me to believe that he was an employee of Silverton Hospital.

"Q   Other than seeing him there * * * and seeing the picture on the wall Chief of Surgery, any other factual basis

why you believe, on [the date of the surgery], Dr. Bernardo was an employee of Silverton Health?

"A   I was never told otherwise.

"Q   Again, same question. I'm looking for affirmative factual basis other than seeing him there at the hospital and his picture on the wall Chief of Surgery, can you cite any other factual basis that led you to believe on March 27, 2012 that Dr. Bernardo was an employee of Silverton Health?

"A   No.

"Q   So I gather that any marketing materials that you may have seen of Silverton Health before the surgery did not lead you to believe Dr. Bernardo was an employee of Silverton Health?

"A   It did lead me to believe that he was.

"Q   I'd asked you what factual basis did you believe on [the date of the surgery] led you to think Dr. Bernardo was an employee, you gave me two reasons; you saw him there, picture on the wall, Chief of Surgery.

"Had you heard something or seen something from Silverton Health before [the date of the surgery] that led you to believe that he was an employee of Silverton Health?

"A   No.

"* * * * *

"Q   *** In making the decision to go ahead with this surgery, did you rely upon the medical advice and counsel of anyone other than Dr. Bernardo?

"A   Just nurses [who] previously told us what a great doctor he was.

"Q   And that's perhaps why you might go with Dr. Bernardo, because some nurse told you he was a great doctor, fair enough.

"A   They work there."

Plaintiff then testified again that she had seen Bernardo's picture on the wall of Silverton Hospital "before" her surgery, but she could not remember precisely when and could not remember when she read any further details below the

picture regarding Bernardo's education, interests, family and surgical specialty. Plaintiff understood the term "Chief of Surgery" to mean that Bernardo was "in charge of the surgery staff" and the "surgical room."

Bernardo performed plaintiff's colectomy surgery in an operating room at Silverton Hospital. During the operation, Bernardo entered plaintiff's abdomen with a laparoscopic device. While initially placing that device, Bernardo lacerated the right renal vein and the inferior vena cava, a major blood vessel that carries blood from the lower body to the heart. Bernardo attempted vascular surgery to repair the damage and completed the colectomy. Plaintiff was then airlifted to OHSU to address the complications that arose during that surgery. At OHSU, surgeons discovered further vascular injuries, including damage to plaintiff's portal vein that had been closed completely, affecting the flow of blood and oxygen to plaintiff's liver. Plaintiff suffered significant damage to several major blood vessels and her liver, resulting in severe and costly physical injury.

The crux of plaintiff's argument is that, based on the foregoing facts, a reasonable factfinder could conclude that Bernardo was Silverton Hospital's actual or apparent agent, and, therefore, that there is at least a question of fact as to whether the hospital is vicariously liable for Bernardo's alleged negligence during plaintiff's surgery.

Generally, an agency relationship "results from the manifestation of consent by one person to another that the other shall act on behalf [of] and subject to his control, and consent by the other so to act." *Eads v. Borman*, 351 Or 729, 735, 277 P3d 503 (2012) (*Eads II*).[3] An agency relationship can arise based on "actual consent (express or implied) or from the appearance of such consent." *Id.* at 736. Whether actual or apparent, "the principal is bound by or otherwise

---

[3] In *Eads I*, we decided the defendant landlord's vicarious liability on a theory of both actual and apparent agency. 234 Or App at 329, 332. The plaintiffs in that case abandoned their actual agency theory before the Supreme Court, and the court decided only the apparent agency theory. *Eads II*, 351 Or at 736 n 3. As discussed below, however, the Supreme Court did address some general principles of agency that apply when an agent causes physical injury. In our discussion, we generally rely on *Eads I* for our discussion of plaintiff's actual agency theory and *Eads II* for plaintiff's apparent agency theory.

responsible for the actual or apparent agent's acts" if "the acts are within the scope of what the agent is actually or apparently authorized to do." *Id*. Unless the evidence allows only one inference, whether a person is the actual or apparent agent of a putative principal is a question of fact for the jury. *See Shepard v. Sisters of Providence*, 89 Or App 579, 585-89, 750 P2d 500 (1988) (explaining the jury's role in determining issues of actual and apparent agency when the evidence supports competing inferences).

B.  *Actual Agency*

We begin with the elements of actual agency. For a party to establish actual agency, that party must show that "the principal ha[s] a right to control the acts of its agent" and "both parties must also agree that the agent will act on the principal's behalf." *Eads I*, 234 Or App at 329. For physicians to be the actual agents of a hospital or other health care provider, the latter "need not have a level of control that would cause the physicians to abrogate their independent professional judgment." *Id*. at 331 (internal quotation marks and brackets omitted). But there still must be some evidence that the physician and the putative principal mutually agreed that the former will act on the principal's behalf, and the principal must have a right of control over the physician's acts that caused the injury. *Id*. at 332.

When the agent's conduct causes physical injury, there are additional principles that come into play. *Eads II*, 351 Or at 738. In *Eads II*, the Supreme Court made clear that, in cases involving "physically injurious conduct," whether based on actual or apparent agency, a second set of legal principles arise. *Id*.

> "[T]o impose vicarious liability for a nonemployee agent's physical conduct, the principal must have—or appear to have—a right to control how the act is performed—that is, the physical details of the manner of performance—that is characteristic of an employee-employer relationship."

*Id*. at 739-40 (internal quotation marks and emphasis omitted). The right of control or apparent right of control must be "over the agent's injury-causing actions." *Id*. at 739.

Two of our cases illustrate the foregoing principles. In *Bridge v. Carver*, 148 Or App 503, 509-10, 941 P2d 1039, *rev den*, 326 Or 57 (1997), we concluded that the evidence supported a finding that a county-run health care program had actual authority over a physician. Although the physician was not a county employee, a written agreement between the parties evidenced their mutual consent to an agency relationship. *Id*. at 506. The county controlled the patients that the physician saw, when he saw them, and the general scope of his treatment within the county program. *Id*. at 509. By contrast, we concluded in *Eads I* that the putative principal did not have actual authority over a nonemployee physician. 234 Or App at 332. In that case, "there [was] no indication that anyone agreed that [the physician] would act as an agent for defendant," and there was no evidence that anyone other than the physician "controlled what patients he saw, when he saw them, and the scope of treatment he provided to them." *Id*.

We turn to an application of those principles to the minimal record we have regarding Silverton Hospital's control over Bernardo. Silverton Hospital had granted Bernardo privileges to treat patients and perform surgeries at the hospital. In order to obtain privileges, Bernardo had agreed to the medical staff bylaws. Neither the bylaws nor any other agreement in the summary judgment record indicated that Bernardo was an employee or agent of Silverton Hospital. Under the bylaws—and in contrast to the agreement between Silverton Hospital and its employee-physicians—the hospital paid Bernardo a fee for responding to calls from the hospital emergency room while he was "on call," but it did not pay Bernardo's regular salary, offer Bernardo benefits or liability insurance, supply overhead, facilitate patient billing, restrict where Bernardo could seek and obtain privileges, or directly supervise Bernardo's day-to-day practice of medicine. Nor is there any other evidence to suggest that anyone other than Bernardo controlled what patients he saw in his private practice or when, where, and how he saw and treated his patients.

Based on the available evidence, it does not appear that the hospital dictated or otherwise controlled Bernardo

in his surgical practice, notwithstanding the fact that Silverton Hospital was the site of plaintiff's surgery and the hospital staff assisted to some extent in the surgery. In light of the lack of evidence in the summary judgment record of Silverton Health's right to control Bernardo's surgical practice, we conclude that a reasonable factfinder could not conclude that Bernardo was an actual agent of Silverton Hospital in performing plaintiff's surgery.

In arguing to the contrary, plaintiff relies heavily on our decision in *Themins v. Emanuel Lutheran*, 54 Or App 901, 637 P2d 155 (1981), *rev den*, 292 Or 568 (1982). *Themins* and our related case law address the principal-agent relationship between hospitals and doctors. We have stated that "physicians who are nominally 'independent contractors' may be treated as actual or ostensible hospital agents, for purposes of vicarious liability, when they perform professional services which are integral to hospital operations and which hospitals hold themselves out to the public to provide." *Shepard,* 89 Or App at 587.

In *Themins*, we considered whether a resident doctor who was doing his residency at the University of Oregon Health Sciences Center, but on rotation at Emanuel Hospital, could be an agent of the latter hospital when he injured a patient there while on rotation. 54 Or App at 903-04. We concluded that there was an issue of fact precluding summary judgment because the resident "was arguably acting as an agent in performing an inherent function of the hospital, a function without which the hospital could not properly achieve its purpose." *Id*. at 908 (internal quotation marks omitted). Plaintiff acknowledges in her briefing that she must show "some degree of control" by Silverton Hospital over Bernardo to meet the requirements of actual agency, but argues that, when a physician is performing an integral service of the hospital, "then a reasonable juror can infer that the physician is the hospital's actual agent."

We note that it is unclear whether *Themins* applies only in the context of apparent agency or also to actual agency. *See id*. (stating that a jury could have found the doctor an "'ostensible,' if not actual, agent of Emanuel"). In *Eads*, both our court and the Supreme Court treated *Themins* and

its progeny as apparent agency cases. *See Eads II*, 351 Or at 745 n 13 (referring to *Themins* and related Court of Appeals cases as apparent agency cases); *Eads I*, 234 Or App at 335 n 7 (characterizing *Themins*, *Shepard*, and other cases as applying the "doctrine of apparent agency"). We discuss this issue further below when we address apparent agency.

Regardless, proof that a doctor is providing an integral or inherent service of the hospital is not, at least on its own, sufficient to demonstrate that the hospital is exercising actual control over "how the act is performed—that is, the physical details of the manner of performance—that is characteristic of an employee-employer relationship" or to show that the hospital controls the doctor's "injury-causing actions." *Eads II*, 351 Or at 739 (internal quotation marks omitted). "The fact that a nonemployee is actually or apparently authorized in some general way to act on a principal's behalf is not a sufficient basis to impose vicarious liability on the principal for the actual or apparent agent's tortious conduct." *Id*. In addition, plaintiff did not present any evidence that there was an agreement that Bernardo would act on Silverton Hospital's behalf in performing surgeries. Consequently, the trial court did not err when it granted Silverton Hospital summary judgment because plaintiff failed to raise an issue of fact that Bernardo was the hospital's actual agent when performing plaintiff's surgery.

C.  *Apparent Agency*

We turn to address the trial court's grant of summary judgment to Silverton Hospital on the basis that Bernardo could not be an apparent agent of the hospital on this record as a matter of law. "[A]pparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter." *Id*. at 736. Our Supreme Court has followed the weight of authority from other jurisdictions to conclude that, "in a proper case, a hospital or other entity can be held vicariously liable for a physician's negligence on an apparent authority theory." *Id*. at 745.

Whether this is a proper case turns on the following elements: "(1) whether the putative principal held itself out, expressly or implicitly, as a direct provider of medical care so as to lead a reasonable person to conclude that the negligent actor who delivered the care was the principal's employee or agent in doing so"; and "(2) whether the plaintiff relied on those representations by looking to the putative principal, rather than to a specific physician, as the provider of the care, and not just as a situs in which a physician of the plaintiff's choosing provided the care." *Id*. at 746. As noted above, because this is a case arising out of physical injuries, there is an additional requirement for plaintiff to show that the principal *appears* to have a right to control how the agent performs the injury-causing act in a manner that is characteristic of an employee-employer relationship. *Id*. at 739-40.

1.  *Holding itself out as a direct provider*

With respect to the first element—whether the hospital "held itself out *** as a direct provider of medical care"—the Supreme Court in *Eads II* explained that, increasingly, "modern-day hospitals are engaged in directly providing medical care and services, rather than merely providing a situs where medical professionals do so in furtherance of their individual medical practices." *Id*. at 743. As a result of that shift, "hospitals are now run like businesses and promote themselves based on the superior quality of the health care they offer." *Id*. Even apart from commercial advertising, "hospitals cultivate high visibility in their communities to present themselves as vital to community health rather than as mere facilities in which private physicians practice their professions." *Id*. (internal quotation marks omitted). By that "holding out," a hospital "cultivates an image that causes the public to assume, correctly or not, that the hospital exerts some measure of control over the medical activities integral to the hospital setting." *Id*. (internal quotation marks omitted); *see also Jennison v. Providence St. Vincent Medical Center*, 174 Or App 219, 231-32, 25 P3d 358 (2001) (stating that, "if the hospital undertakes to provide certain services to the public and there is no evidence indicating that the patient was aware of the physician's nonemployee status, then the 'holding out' requirement of the doctrine is satisfied").

A related question is whether the services that the hospital allegedly held itself out as the direct provider of are "integral to the hospital setting." *Eads II*, 351 Or at 743; *see also Shepard*, 89 Or App at 587 (explaining that a nonemployee physician may be the "ostensible agent" of a hospital if they "perform professional services which are integral to hospital operations"). A putative agent provides an "integral" service by "performing an inherent function of the hospital, a function without which the hospital could not properly achieve its purpose." *Shepard*, 89 Or App at 584 (internal quotation marks omitted). We have previously discussed examples of "integral" services that, depending on the facts in each case, may include emergency, radiology, and pathology services. *Id.* at 586; *cf. Jones v. Salem Hospital*, 93 Or App 252, 267, 762 P2d 303 (1988), *rev den*, 307 Or 514 (1989) (concluding that pediatric services are not "integral to hospital operations").[4] But we have neither purported to provide an exhaustive list of "integral" services that exist as a matter of law nor have we concluded that surgical services cannot be integral to the hospital setting. Rather, whether a medical service is integral to the hospital setting is a fact-intensive inquiry best resolved by the jury unless the evidence at summary judgment allows but one reasonable inference.

### 2.  *Reasonable reliance*

With respect to the second element of apparent agency—reasonable reliance—that inquiry turns on whether the plaintiff "looked to and relied on the hospital as the

---

[4] In *Jones*, a 1988 case, we concluded that pediatric services were not "integral to hospital operations," because they are "among the general run of professional specialties which private practitioners, with privileges on a hospital's medical staff, perform on hospital facilities." 93 Or App at 267. Without deciding the issue, we note that our reasoning in *Jones* for rejecting the possibility that pediatric services could be "integral to hospital operations" may be called into question by the Supreme Court's subsequent opinion in *Eads II* and could be belied by current hospital practices. As discussed, *Eads II* highlighted a modern trend in hospital operations, whereby hospitals are increasingly "engaged in directly providing medical care and services, rather than merely providing a situs where medical professions do so in furtherance of their individual medical practice." 351 Or at 743. Modern hospitals, in other words, are now more likely to promote and integrate a wide range of specialized services into the core of hospital operations, which may, depending on the facts, allow for a broader spectrum of services to be deemed "integral."

direct provider of the medical services rendered." *Eads II*, 351 Or at 744. In some circumstances, "if a patient seeks medical services from a physician who has staff privileges at a hospital and who uses the hospital merely as the situs for the physician's own medical practice, the necessary reliance on the hospital as a direct provider of care is lacking." *Id*. However, if the patient reasonably relies on the reputation of the hospital itself as a care provider and does not knowingly choose to receive care from a nonemployee physician who will merely use the hospital as the situs of care, a jury may reasonably conclude that the second element of apparent agency has been met. *Id*.

3. *Bernardo as apparent agent of Silverton Hospital*

With that background in mind, we consider whether, in light of the summary judgment record and drawing all inferences from the facts therein in plaintiff's favor, a reasonable factfinder could find that an apparent agency relationship existed between Silverton Hospital and Bernardo. As to the first element, the record provides a basis from which a reasonable factfinder could conclude that Silverton Hospital held itself out as the direct provider of surgical services, such that it was the hospital that was ultimately providing plaintiff's care. For example, Silverton Hospital held itself out to the public through advertisements and promotional materials as a provider of general medical services, as well as emergency vascular care and general surgical services of the sort plaintiff received from Bernardo. To that end, it directly promoted its surgical services to the community. From those facts, a reasonable factfinder could conclude that Silverton Hospital held itself out as a care provider, not merely as a situs where independent care providers could offer their services.

A reasonable factfinder could also conclude that Silverton Hospital specifically held Bernardo out as its agent who would perform the surgical services that were ultimately provided and controlled by the hospital. Bernardo was featured in advertisements touting Silverton Hospital's surgical program. Bernardo was also held out to the public as Silverton Hospital's "chief of surgery." Not only did he hold that position, Bernardo's photograph hung on a wall in

Silverton Hospital with a plaque giving his title. The hospital emergency room staff called Bernardo in to treat plaintiff and initiated the relationship between plaintiff and Bernardo. Bernardo treated plaintiff in Silverton Hospital for multiple days. During that time, Silverton Hospital staff members vouched for Bernardo, even referring to him as one of "our" best. Based on the summary judgment record, neither Silverton Hospital's staff or administration nor Bernardo himself informed plaintiff that Bernardo was not a Silverton Hospital employee.

Silverton Hospital argues that "chief of surgery" is solely an administrative position that is not indicative of control or authority by the hospital over the individual who holds that position. We see no reason on this record why an ordinary hospital patient would be aware of that distinction, especially when the hospital advertises the chief of surgery to patients and other hospital visitors. More importantly, we see no reason why a reasonable factfinder would have to draw the conclusion that "chief of surgery" is solely a title for administrative purposes and not related to the hierarchy of the hospital's surgery team for providing surgical services on behalf of the hospital. As we explained in *Jennison*, "[t]he public, in looking to the hospital to provide *** care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein." 174 Or App at 236.

In addition, a reasonable factfinder could find that the surgical services offered and performed by Bernardo for plaintiff at Silverton Hospital are, at least under the facts of this case, of the sort that are "integral" to the hospital's operations. Silverton Hospital engaged in pervasive and sophisticated advertising in order to present itself to the community as a provider of vital medical services, including a variety of surgical services. More than that, in a physician employment agreement created by Silverton Hospital, the company proclaims that its "goal" is to provide "comprehensive health care services"—including care from "General Surgeon physicians"—because of the "need" for such services in the community. To that end, the Silverton Hospital chief executive officer explained in his deposition in this

case that general surgery was among the "core" services provided by the hospital to the community. Although we do not decide whether nonemergency surgery is categorically integral to every hospital, there was sufficient evidence at summary judgment to support an inference that it is integral to Silverton Hospital's operations.

A reasonable factfinder could also find that plaintiff has established the second element of apparent agency, reasonable reliance. As we summarized, Silverton Hospital held itself out as a provider of both general and specialized medical services, including various surgical specialties. The emergency room staff called Bernardo in to examine plaintiff in the emergency room while she was there for diagnosis and treatment of a serious medical condition. Bernardo introduced himself to plaintiff as the doctor who would be caring for her during her stay, and Bernardo's skills were vouched for by Silverton Hospital staff members. Bernardo continued to visit and treat plaintiff in Silverton Hospital over the course of three days. Plaintiff was never advised during that time or at any time before her surgery that Bernardo was *not* an employee of Silverton Hospital, and there is no evidence that plaintiff had actual knowledge of Bernardo's employment status.

Most significantly, Silverton Hospital advertised Bernardo to hospital visitors as the "chief of surgery." Plaintiff testified that she understood from Silverton Hospital having placed Bernardo's picture on the hospital wall with the title "chief of surgery" that he was, in fact, the chief of surgery for the hospital. Plaintiff understood that to mean that Bernardo was in charge of the surgery staff and "surgical room" for the hospital. A reasonable factfinder could certainly credit plaintiff's reasonable belief that Bernardo was acting as head of surgery for Silverton Hospital and not merely, as the hospital contends, in an administrative function that was not representative of Bernardo's surgical work on behalf of the hospital. Of course, a factfinder could find otherwise, but the record does not support only one reasonable inference.

Silverton Hospital contends that the hospital was merely the situs of plaintiff's surgery and not a place that

plaintiff intended to directly provide and be responsible for her medical care. In support of that argument, Silverton Hospital points to the fact that, before her surgery, plaintiff visited Bernardo several times at his Salem office, which was not connected with the hospital. It also points to other evidence in the record regarding, among other things, plaintiff's choice of the hospital over other possible locations for her surgery.

We acknowledge those facts and they support one reasonable inference, but that is not the only inference a reasonable factfinder could draw. Taken together, the facts at least support an inference that plaintiff reasonably believed that Bernardo was providing medical care on behalf of Silverton Hospital and that she relied on that belief when making decisions regarding her treatment. A reasonable factfinder could conclude that a person in plaintiff's position would not have known that Bernardo, a surgeon whom plaintiff first encountered in the hospital emergency room in a patient-doctor capacity, was not employed and directly supervised by Silverton Hospital. As explained in *Jennison*,

> "[t]he public, in looking to the hospital to provide * * * care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. * * * Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be."

174 Or App at 236.

Further, on this summary judgment record, plaintiff at least created an issue of fact that Silverton Hospital *appeared* to have a right to control Bernardo as the hospital's designated chief of surgery in the conduct of his surgeries, including his surgery on plaintiff, that was similar to the control existing in an employer-employee relationship. *Eads II*, 351 Or at 739-40. A reasonable factfinder could find that a chief of surgery of a hospital is acting as an employee or engaging in employee-like duties when performing surgery for that hospital and is not an independent contractor or visitor over whom the hospital does not appear to have any right to control.

In sum, a reasonable factfinder could find that Silverton Hospital held itself out as the direct provider of plaintiff's care and that plaintiff relied on that manifestation when she elected to have Bernardo perform her surgery at the hospital. A reasonable factfinder could also find that Silverton Hospital appeared to have a right to control Bernardo in his surgery on plaintiff. We therefore conclude that the trial court erred in granting summary judgment in Silverton Hospital's favor with respect to plaintiff's apparent agency theory of vicarious liability.

## II.  PLAINTIFF'S CHALLENGE TO THE TRIAL COURT'S GRANT OF SILVERTON HOSPITAL'S MOTION TO DISMISS

Plaintiff also contends that the trial court erred when it dismissed her claim against Silverton Hospital for negligently hiring, retaining, and supervising Bernardo. The hospital, which refers to this claim as a "negligent credentialing claim," moved to dismiss the allegations that could give rise to such a claim, namely paragraphs 18(a) and 18(c) through 18(i) of plaintiff's complaint. The hospital's arguments in the trial court, broadly speaking, fit into two categories: one, that there is no claim for "negligent credentialing" under common law or by statute, and, two, that even if there were such a claim, that claim has either been abrogated by or effectively precluded by a hospital's peer review privilege under ORS 41.675. After a hearing, the court concluded that it was "persuaded by defendant's arguments," separately noting that it did not believe that there was either an express or implied cause of action.

We review the trial court's grant of a motion to dismiss under ORCP 21 A(8) for legal error, accepting as true all well-pleaded allegations in the complaint and giving plaintiff the benefit of all favorable inferences that may be drawn from the facts alleged. *Deep Photonics Corp. v. LaChapelle*, 282 Or App 533, 548, 385 P3d 1126 (2016), *rev den*, 361 Or 524 (2017) (citing *Granewich v. Harding*, 329 Or 47, 51, 985 P2d 788 (1999)). A court may not grant an ORCP 21 A(8) motion to dismiss on the basis of anything other than the body of the pleadings themselves. *Deep Photonics Corp.*, 282 Or App at 548. Thus, where a defendant's ORCP 21 A(8)

challenge is based on a defense to otherwise well-pleaded claims, that defense is available only if it arises from the face of the complaint. *Id*.

Here, Silverton Hospital successfully moved to dismiss paragraph 18, subparagraphs (a) and (c) to (i), of plaintiff's complaint. In those subparagraphs, plaintiff alleged the following:

"[18.]   Defendant Silverton Hospital was negligent in one or more of the following ways, which caused injury to the plaintiff:

"a.   In allowing defendant Dr. Bernardo to continue to perform surgery on plaintiff Gail Towner after it became apparent that he had injured her major blood vessels and was not qualified to repair them;

"*  *  *  *  *

"c.   In granting privileges to defendant Dr. Bernardo to perform surgery;

"d.   In granting privileges to defendant Dr. Bernardo to perform laparoscopic procedures using the Visiport system, without verifying or confirming that he had the requisite training and experience to use the system;

"e.   In failing to restrict or terminate Dr. Bernardo's surgical privileges, including privileges to perform laparoscopic procedures using the Visiport system, prior to March 27, 2012, when defendant Hospital knew or should have known that Dr. Bernardo had performed other laparoscopic surgeries on patients at defendant Hospital, who sustained injuries following such surgeries by Dr. Bernardo;

"f.   In failing to proctor or monitor Dr. Bernardo's surgical practice at defendant Hospital prior to March 27, 2012, when defendant Hospital knew or should have known that such proctoring or monitoring was necessary because of results of prior surgical cases of Dr. Bernardo's;

"g.   In failing to have properly-trained and objective surgeons systematically reviewing and scrutinizing Dr. Bernardo's surgeries performed at defendant Hospital between October, 2006 and March 27, 2012;

"h.   In failing to have in place proper, effective and consistent peer review processes and procedures that were

unbiased and based upon reviews by physicians trained in peer review, as required by law; and

"i.   In failing to recognize that Dr. Bernardo's rate of accidental injuries during surgeries performed by him between October, 2006 and March 27, 2012, was excessive and placed patients, including plaintiff Gail Towner, at increased risk for sustaining a permanent and serious surgical injury."

The allegations can be largely grouped into three separate, albeit related, parts. First, plaintiff alleges that Silverton Hospital either should not have initially granted or should have later revoked Bernardo's general or specific surgical privileges at the hospital. *See, e.g.*, allegations 18(c), (d), (e). Second, plaintiff alleges that the hospital failed to supervise Bernardo's surgical practices as to individual patients, including plaintiff. *See, e.g.*, allegations 18(a), (f). Third, and somewhat related, plaintiff alleges that there was not a sufficient peer review process that reviewed Bernardo's surgeries and outcomes more generally. *See, e.g.*, allegations 18(g), (h), (i).

Silverton Hospital's arguments before us mirror those made to the trial court—namely, that either there is no negligent credentialing claim under law or, if there is, that claim is barred because plaintiff, here, alleged ultimate facts that are "inherently and absolutely privileged and could never be discovered or offered into evidence" by either party under ORS 41.675. Addressing the first argument, we reject Silverton Hospital's attempt to recast plaintiff's claim so narrowly as solely one for "negligent credentialing." At the time of dismissal, plaintiff alleged that Silverton Hospital was *negligent*, based on the hospital's vicarious liability for Bernardo's alleged negligence, which we addressed above, and the hospital's direct liability, which we address now. In alleging Silverton Hospital's direct liability, plaintiff alleged claims that are readily understood as claims for the hospital's negligent hiring of Bernardo as an agent and its subsequent negligent supervision of Bernardo. Claims against a principal alleging direct liability for the principal's negligent hiring and supervision of an agent are well established theories of negligence under the common law. *Vaughn v. First Transit, Inc.*, 346 Or 128, 138 n 7, 206 P3d

181 (2009) (citing *Restatement (Second) of Agency* § 213 (1958) for the proposition that a principal may be directly liable "if the principal itself was negligent in hiring, instructing, or supervising the agent"); *Eads II*, 351 Or at 739 n 6 (acknowledging the possibility of the same in the context of a medical malpractice claim). Therefore, we reject Silverton Hospital's argument that plaintiff's claims for direct liability are not viable under law.[5]

The hospital's contention that plaintiff's direct-liability negligence claim is barred because it alleges ultimate facts that are all absolutely privileged under ORS 41.675 presents a closer issue. To address it, we discuss ORS 41.675 and the peer-review privilege.

A hospital's governing body is responsible for ensuring that physicians admitted to practice at the hospital are "granted privileges consistent with their individual training, experience and other qualifications," that procedures are in place for "granting, restricting and terminating privileges," and that the medical staff is organized "in such a manner as to effectively review the professional practices of the facility for the purposes of reducing morbidity and mortality and for the improvement of patient care." ORS 441.055(1). A "peer review body" includes a hospital's

> "governing bodies or committees * * * or any other medical group or provider of medical services in connection with bona fide medical research, quality assurance, utilization review, credentialing, education, training, supervision or discipline of physicians * * * or in connection with the grant, denial, restriction or termination of clinical privileges at a health care facility."

ORS 41.675(1).

The peer review process is protected by an extensive privilege. Under ORS 41.675(3), "data" provided to or created by a hospital's "peer review body" is privileged and,

_____

[5] The dismissal of a claim is a question of law based on allegations and not, as in summary judgment, a question of whether the plaintiff presented facts to support the claim. Further, there are discovery issues associated with this claim. These issues are not affected by our previous conclusion that plaintiff failed to raise an issue of fact concerning whether Bernardo was an actual agent of the hospital as part of the vicarious liability claim.

with a limited exception for "records dealing with a patient's care and treatment," "shall not be admissible in evidence in any judicial, administrative, arbitration or mediation proceeding." *See also* ORS 441.055(7) ("All findings and conclusions, interviews, reports, studies, communications and statements procured by or furnished to the peer review committee in connection with a peer review are confidential pursuant to [the public records and meetings laws] and all data is privileged."). "Data" includes "all oral communications or written reports to a peer review body, and all notes or records created by or at the direction of a peer review body," ORS 41.675(2), including those data created "in connection with *** credentialing" and "the grant, denial, restriction or termination of clinical privileges at a health care facility," ORS 41.675(1).[6] Further, persons serving on or communicating information to a peer review body or conducting certain peer review investigations "shall not be examined as to any communication to or from, or the findings of, that peer review body or person." ORS 41.675(4).

We have previously recognized that the privilege applies broadly and is not overcome when certain evidence is highly probative, or even essential, to a particular claim. *See Stumpf v. Continental Casualty Co.*, 102 Or App 302, 306, 794 P2d 1228 (1990) ("By its terms, the privilege afforded by [ORS 41.675] applies 'in any judicial proceeding' regardless of the relevance of the evidence."). Thus, data provided to or from a hospital peer review committee relating to the granting of privileges, supervision of doctors, or revocation of privileges is "privileged and shall not be admissible in evidence in any judicial proceeding."

The issue before us is what effect the privilege and lack of admissibility in court has when the allegations of the complaint, as they do in this case, allege negligence by the hospital in connection with the granting and revocation of privileges, the supervision of a doctor, and the peer review process of a doctor involved in an allegedly negligent

---

[6] ORS 41.675(6) provides an exception, not at issue here, for "proceedings in which a health care practitioner contests the denial, restriction or termination of clinical privileges by a health care facility," but "any data disclosed in those proceedings" remains inadmissible "in any other judicial, administrative, arbitration or mediation proceeding."

surgical procedure, but do not necessarily require the use of confidential peer review materials as a matter of proof.

This is not an issue of absolute immunity as the hospital itself is not immune from negligence lawsuits.[7] It is also not an issue where it is impossible for a plaintiff, because a plaintiff can rely on documents other than a hospital's records, to seek to prove negligence by the hospital. That is, it is at least plausible that a plaintiff could obtain proof from third parties, public records, or other sources to try to demonstrate that a hospital should have provided greater oversight to a surgeon who, for instance, had a history of prior negligence in particular surgeries. Further, we note that plaintiff's assignment of error challenges the trial court's grant of a motion to dismiss and there is no factual record on these issues. Any such factual record, however, would be circumscribed by the restrictions of ORS 41.675(3). Silverton Hospital argues that it would be severely limited, if not prevented entirely, from effectively defending itself based on the confidentiality of its peer review records and, therefore, ORS 41.675 "functionally abrogated" any claims based on allegations that relate to the granting or revocation of privileges or the supervision of doctors through the peer review process.

We have not addressed this issue before but have some guidance from somewhat similar circumstances. For instance, there is an "absolute privilege accorded a party in a judicial proceeding when the communications are in the institution of or during the course and as a part of a judicial proceeding in which he participates, if the matter has some relation thereto." *Franson v. Radich*, 84 Or App 715, 719, 735 P2d 632 (1987) (internal quotation marks omitted). We noted that, although absolute privilege is an affirmative defense that must be raised by answer, "it may be raised by motion to dismiss if the * * * complaint alleges facts which, if true, establish the privilege." *Id.* at 718. Thus, where the allegations in a complaint for intentional infliction of emotional

---

[7] ORS 41.675(5) provides immunity to certain persons serving on or communicating information to a peer review body. It does not immunize the hospital generally, but, as we discuss, the issue in this case is whether certain allegations of negligence that unquestionably relate to the peer review process can form the basis for a negligence claim.

distress allege statements in a judicial proceeding that are protected by the absolute privilege, the trial court does not err in dismissing the allegations. *Id*. at 719. In *Franson*, however, the allegations necessary to prove the claim were themselves based entirely on absolutely privileged statements made in judicial proceedings. *Id*. at 718-19. Here, the proof of the negligent hiring and supervision allegations does not necessarily require plaintiff to use confidential peer review materials, although those documents may be the most obvious source for the claim, and the defense also does not necessarily require them for a defense, although it may be significantly hampered by its inability to use such documents.

More recently, we concluded that, assuming a defendant could raise attorney-client privileged communications to support a motion to dismiss for failure to state a claim, "a defendant must show that the [privilege] applies to all of the allegations in the complaint such that it prevents the defendant from mounting an effective defense." *Deep Photonics Corp.*, 282 Or at 551; *see also Alfieri v. Solomon*, 358 Or 383, 392, 365 P3d 99 (2015) (accepting the parties' agreement that a trial court may strike allegations in a complaint to the extent that those allegations are based on confidential mediation communications and affirming the trial court's striking some of the plaintiff's allegations).

In *Deep Photonics Corp.*, we explained the process for resolving a motion to dismiss when a privilege applies to all of the allegations in a complaint in such a way as to prevent an effective defense:

> "That requires a defendant to show that it is apparent on the face of the complaint that *** protected communications exist that are necessary to the defense of the complaint and that the client has not waived the privilege *** with respect to those communications. In turn, a plaintiff thus may defeat that showing on a motion to dismiss if the allegations in the complaint support a reasonable inference [that the privilege does not apply or an exception to the privilege exists]."

282 Or App at 551. We note that plaintiff does not appear to contend that any peer review records relating to

Bernardo—to the extent that the hospital has any—are subject to an exception to privilege, would not be privileged, or that such a privilege has been or could be waived.

From these cases addressing somewhat similar circumstances, we glean that where a party alleges a claim asserting ultimate facts that are themselves necessarily privileged or confidential communications and form the sole basis for the claim, that claim is subject to dismissal for failure to state a claim. *Franson*, 84 Or App at 719. This is not such a case because, as noted above, it is at least plausible that plaintiff could seek to prove her allegations based on facts that are not found within Silverton Hospital's peer review records.

Rather, the issue is whether defendant has shown that "it is apparent on the face of the complaint that \*\*\* protected communications exist that are necessary to the defense of the complaint." *Deep Photonics Corp.*, 282 Or App at 551. As noted above, the allegations relate to Silverton Hospital's decision to credential Bernardo with hospital privileges, its supervision of Bernardo, and its peer review process relating to Bernardo's work. *To the extent that Silverton Hospital has such documents and information in its peer review files*, the allegations do implicate peer review documents and information that are protected under ORS 41.675(3) that at least would appear necessary to Silverton Hospital's defense. However, that assumes that the hospital has such relevant documents. It is at least possible that the hospital conducted no process in deciding to credential Bernardo, supervise him, or undertake a peer review of his surgical outcomes. As plaintiff contends, to permit the hospital to succeed on a motion to dismiss by raising the peer review privilege would allow it to "tak[e] advantage of the veil cloaking the peer-review process and asks this court to assume it contains" relevant and privileged evidence. We cannot make that assumption on a motion to dismiss.

We conclude that the trial court erred in dismissing the claims arising out of allegations in paragraph 18, subparagraphs (a) and (c), relating to Silverton Hospital's granting or revocation of Bernardo's general or specific surgical privileges, its supervision of Bernardo's surgical practices,

and its peer review process that reviewed Bernardo's surgeries and outcomes. We do not reach the issue of whether plaintiff might still be foreclosed in pursuing those claims following a more developed factual record on summary judgment and based on the standards set forth above. As we discussed, peer review data under ORS 41.675(3) is privileged. Further, peer review data "shall not be admissible in evidence in any judicial *** proceeding." ORS 41.675(3). The statute, however, does not prohibit a trial court from reviewing documents *in camera* to determine if there is peer review information relevant to the hospital's defense or considering declarations submitted by the hospital that may address how it is prevented from mounting an effective defense without the use of its peer review records. As necessary here, we hold only that the allegations here do not prevent plaintiff from proceeding on her complaint and leave any further proceedings on these claims to the trial court.

### III. PLAINTIFF'S CHALLENGE TO THE TRIAL COURT'S GRANT OF SILVERTON HOSPITAL'S MOTION TO STRIKE

Plaintiff next argues that the trial court erred by granting the hospital's motion to strike the following allegation from plaintiff's first amended complaint: "[D]efendant hospital was responsible for and had a non-delegable duty to provide quality care within its facility under ORS 441.055, and is therefore directly and vicariously liable for the negligent conduct of defendant Dr. Bernardo." The trial court granted Silverton Hospital's motion, concluding that, "at this time in Oregon[,] there is no non-delegable duty in this situation."

A court may strike "any sham, frivolous, irrelevant, or redundant matter inserted in a pleading." ORCP 21 E(2). If an allegation in a complaint is legally insufficient, the court may strike it as either frivolous or irrelevant. *Davis v. Tyee Industries, Inc.*, 295 Or 467, 482 n 14, 668 P2d 1186 (1983). Generally, we review orders to strike for abuse of discretion. *Alfieri*, 358 Or at 391. However, if a court's exercise of discretion is dependent on a legal question, such as the meaning of a statute or the existence of a claim as a matter of law, we review that determination for legal error. *Id.*

The ruling on the motion to strike in this case turns on whether, as a matter of law, an Oregon hospital has an absolute, nondelegable duty to ensure that all non-emergency, nonemployee physicians provide "quality care" while treating patients in the hospital facility.[8] We review for legal error to determine whether the trial court correctly concluded that no such duty exists under Oregon law.

As a general rule, an entity that hires an independent contractor is not liable for the contractor's negligence. *Boothby v. D.R. Johnson Lumber Co.*, 341 Or 35, 46, 137 P3d 699 (2006). There are some instances, however, where the entity is subject to a duty that cannot be delegated, such that it is liable for the negligence of its independent contractors for harms encompassed by that duty regardless of whether the entity itself was negligent. Nondelegable duties "arise in situations in which the law deems a particular duty so important and so peremptory that it will be treated as nondelegable." *Johnson v. Salem Title Co.*, 246 Or 409, 413, 425 P2d 519 (1967) (internal quotation marks omitted). The legislature is capable of imposing a nondelegable duty by statute. As the Supreme Court has explained,

> "[o]ne who by statute *** is under a duty to provide specific safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

*Id.* at 414 (citing *Restatement (Second) of Torts* § 424 (1965)). Whether a statute imposes a nondelegable duty that renders a defendant liable for the conduct of a third party is a question of law. *Id.* at 417.

As noted, plaintiff alleged in her complaint that the legislature imposed a nondelegable duty on Oregon hospitals to ensure that all physicians—whether employed by the hospital or not—provided "quality care" when treating

---

[8] Silverton Hospital also contends for the first time on appeal that plaintiff's allegation that Silverton Hospital had a nondelegable duty of care improperly alleged a conclusion of law. Silverton Hospital did not raise this argument before the trial court and we do not reach it. We assume, without deciding, that plaintiff properly alleged an ultimate fact.

patients in a hospital's facilities under ORS 441.055, which describes requirements for a health care facility's medical staff and bylaws. Our courts have not expressly considered whether ORS 441.055 imposes a nondelegable duty on hospitals to ensure "quality" patient care. *But see G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 67-68, 757 P2d 1347 (1988) (stating in *dicta* in a case involving the attempted rape of a patient by a physician in a hospital that "[t]he standards of care provided under the authority of ORS 441.055 do not establish any duties for patient safety," and that "the legislature could, if it chose, impose much greater responsibilities on hospitals [than it did through ORS 441.055]"). We therefore must interpret the statute to determine whether the legislature intended to impose such a duty. To discern the legislature's intention, we examine the text in context and consider any useful legislative history provided by the parties. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). Text and context are given primary weight in the analysis, while legislative history receives "whatever weight the court deems appropriate." *City of Corvallis v. Pi Kappa Phi*, 293 Or App 319, 336, 428 P3d 905 (2018) (citing *Gaines*, 346 Or at 166, 171).

We begin with the text. ORS 441.055 imposes a number of affirmative obligations on the "governing body" of a hospital:

"(1)   The governing body of each health care facility shall be responsible for the operation of the facility, the selection of the medical staff and the quality of care rendered in the facility. The governing body shall:

"(a)   Ensure that all health care personnel for whom state licenses, registrations or certificates are required are currently licensed, registered or certified;

"(b)   Ensure that physicians admitted to practice in the facility are granted privileges consistent with their individual training, experience and other qualifications;

"(c)   Ensure that procedures for granting, restricting and terminating privileges exist and that such procedures are regularly reviewed to ensure their conformity to applicable law;

> "(d)   Ensure that physicians admitted to practice in the facility are organized into a medical staff in such a manner as to effectively review the professional practices of the facility for the purposes of reducing morbidity and mortality and for the improvement of patient care; and
>
> "(e)   Ensure that a physician is not denied medical staff membership or privileges at the facility solely on the basis that the physician holds medical staff membership or privileges at another health care facility."

The statute goes on to require the medical staff to adopt bylaws, which must include "[p]rocedures" to ensure that the hospital adheres to the responsibilities enumerated in ORS 441.055(1). ORS 441.055(2).

Based on the statutory text, the legislature did not expressly impose a nondelegable duty to provide quality patient care on the hospital or its governing body. The text does not establish any "specific safeguards or precautions for the safety of others" as to how any particular medical procedures are to be performed, or even how admissions and peer review must be conducted. *Cf. Johnson*, 246 Or at 414-15 (holding that an architect had a nondelegable duty to meet the minimum safety standards of the building code). Instead, it establishes that the governing body of a hospital is responsible for ensuring that the hospital has a particular organizational structure and procedures to effectively admit new staff and conduct peer review of physicians who provide care within the hospital as a prerequisite to obtaining and maintaining a license from the state. Although the text provides that the governing body is "responsible" for the "quality of care rendered in the facility" and references the reduction of "morbidity and mortality" and the "improvement of patient care" as goals, it does so in a narrow context; rather than making the hospital's governing body responsible for achieving a particular standard of care and reducing morbidity or mortality in an abstract or even quantifiable way, the text requires the governing body only to ensure that the appropriate procedures and organizational structures are in place that the legislature has deemed necessary to provide quality care.

Turning to the statutory context, the legislature codified ORS 441.055 along with other laws describing the "licensing and supervision" of health care facilities and organizations by the state. ORS 441.015 - 441.192. In those statutes, the legislature evinced its concern of ensuring that health care facilities and organizations meet certain threshold requirements and maintain certain standards—many of them structural or procedural—before the state will issue them a license to offer their services to the public. There is little to suggest from the obligations imposed throughout those statutes that the legislature simultaneously imposed a nondelegable duty on hospitals to provide specific safeguards to their patients. Seen in that light, the obligations imposed by ORS 441.055(1) are properly read as licensing requirements that do not further establish a health care organization's affirmative duties to its patients. The statutory context suggests that a hospital's governing body must implement procedures and protocols for admitting only qualified doctors to practice medicine and must create an organizational structure in which the medical staff conducts peer review of its members' activities for the purpose of improving patient care only as prerequisites to receiving and maintaining a license from the state.

Finally, we note that the legislative history of ORS 441.055 does not convince us that, notwithstanding the lack of an express signal from the text and context, the legislature intended to impose a nondelegable duty on hospitals to ensure that nonemployee physicians provide "quality care" to the patients they treat within the hospital. The history—which plaintiff cites extensively, with a focus on comments from nonlegislators—instead suggests that the legislature more narrowly intended to ensure that hospitals adhered to procedural and organizational standards that would in turn improve patient care.

Plaintiff's more general argument for the existence of a nondelegable duty is also undermined by the Supreme Court's decision in *Eads II*, in which the court addressed and rejected the possibility that hospitals are absolutely liable for negligent care provided by nonemployee physicians. 351 Or at 744. Although it did not address ORS 441.055, *Eads II* explained that "the mere fact that medical services

are provided on a hospital's premises is not enough to create vicarious liability" because the requisite reliance on the hospital by the patient is lacking. *Id*. Put differently, the Supreme Court was not persuaded—at least on the arguments presented in *Eads II*—that hospitals are absolutely liable for negligent patient care provided within the hospital facility. Indeed, the court went on to explain that a hospital could be liable for the negligence of a nonemployee physician in "a proper case," but would not be presumptively liable. *Id*. at 745-46. That concept of situationally dependent liability is inconsistent with the liability that would arise from the kind of nondelegable duty that plaintiff argues for in this case. *See also G.L.*, 306 Or at 67 ("We recognize that hospitals have taken on special responsibilities by admitting and providing care for those who may not be able to take full care of themselves. We do not, however, believe that such an act of admission makes the hospital absolutely responsible for a patient's safety.").

In sum, the trial court did not err when it struck from plaintiff's complaint the allegation that Silverton Hospital breached a nondelegable duty to ensure adequate patient care by any and all nonemployee physicians. Plaintiff's allegation was legally insufficient because ORS 441.055 does not impose such a duty. It may be that hospitals have a nondelegable duty to make credentialing decisions and conduct peer review and therefore cannot outsource those facets of hospital operations to a third party to avoid liability related to those activities. But it does not follow from the text or context of ORS 441.055 that those structural and organizational requirements contain a latent policy decision by the legislature that hospitals will themselves be liable in all instances when nonemployee physicians fail to provide "quality care" while treating patients in the hospital facility.

## IV. CONCLUSION

The trial court erred, in part, when it granted defendant Silverton Hospital's motion for summary judgment, because a reasonable juror could find, based on the summary judgment record, that Bernardo was an apparent agent of Silverton Hospital in performing plaintiff's surgery. The trial court also erred when it granted Silverton

Hospital's motion to dismiss plaintiff's allegations that the hospital was negligent in "credentialing," hiring, retaining, and supervising Bernardo by giving him privileges at Silverton Hospital and allowing him to perform surgical procedures there. The trial court did not err when it granted Silverton Hospital's motion to strike plaintiff's allegation that the hospital had a nondelegable duty to ensure quality care under ORS 441.055 and, as a result, was liable for Bernardo's conduct. Finally, we do not reach plaintiff's challenge to the trial court's denial of plaintiff's motion to compel, which motion may or may not arise again on remand.

Reversed and remanded.